KENNETH C. BRUNO *v.* CIVIL SERVICE COMMISSION
OF THE CITY OF BRIDGEPORT ET AL.
(11446)

HEALEY, PARSKEY, SHEA, GRILLO and DALY, Js.

336

Argued December 9, 1983—decision released February 28, 1984

*Andrew D. Cretella,* for the appellant (defendant Leonard L. Crone).

*Thomas K. Jackson,* deputy city attorney, for the appellee (named defendant).

*Gregory P. Lynch,* for the appellee (plaintiff).

GRILLO, J. This case is a sequel to that of *Bruno* v. *Civil Service Commission,* 184 Conn. 246, 440 A.2d 155 (1981) (hereinafter *Bruno I*), wherein the plaintiff requested injunctive relief from the civil service commission's (hereinafter commission) refusal to appoint him to the position of recreation superintendent of the city of Bridgeport. The undisputed facts forming the basis for the former appeal are as follows:

In 1969, the plaintiff Kenneth C. Bruno, while a resident of Bridgeport, was appointed to the position of recreation supervisor for the city of Bridgeport. In 1972, he moved to the town of Stratford where he resided until 1980 when he returned to Bridgeport. In September of 1976, the commission announced that it intended to conduct an open, competitive examination for the position of recreation superintendent within the civil service system. The notice of application for this position specifically required "[b]ona fide residence in the City of Bridgeport for not less than one year immediately preceding the date of examination." Pursuant to the notice, the plaintiff made his application for the position and examination although he did not meet the residency requirement. The defendant Leonard L. Crone, who met the rule II (3)[1] durational residency requirement as provided in the notice, also applied for the position and examination.

---

[1] Rule II (3) of the rules of the civil service commission of the city of Bridgeport provides: "No person shall be admitted to an examination for any class of positions in the classified service who has not been a bona fide resident of the City of Bridgeport for at least twelve consecutive months immediately prior to the date of the examination; provided that such requirement of residence may be suspended by the Commission as to any class or classes of positions requiring highly professional, scientific or technical qualifica-

By letter dated October 18, 1976, the commission notified the plaintiff that his application to take the recreation superintendent examination was disapproved for failure to meet the requirement as to bona fide residence in the city of Bridgeport. The plaintiff appealed this denial to the commission and was subsequently notified that he would be permitted to take the examination "without prejudice to the merits of the residency question" and that his taking of the examination was in "no way a waiver" of the residency requirement.

The examination for the position of recreation superintendent consisted of individual oral interviews at various times and an evaluation of the applicant's training and experience. On December 17, 1976, the civil service commission notified the plaintiff that he had achieved the highest score among all persons examined. When Crone was informed that he had scored second highest on the examination, he appealed to the commission challenging his placement as number two on the employment list.

On April 4, 1977, the commission, acting in accordance with instructions from the city attorney of Bridgeport, voted not to appoint the plaintiff to the position of recreation superintendent. Thereafter, on October 6, 1977, the plaintiff filed an action against the commission seeking an injunction restraining the commission from refusing to appoint him to the position of recreation superintendent. After Crone was granted leave to be made a party defendant, he filed an answer, cross complaint and counterclaim seeking a declaratory judgment that he was entitled to the position of recre-

tions, or in case where through low compensation for services such a requirement is disadvantageous to the public interest, but all such cases with the reasons therefore, shall be reported in the annual report of the commission to the mayor."

ation superintendent. The issue was joined on Crone's counterclaim by the filing of an answer by the commission and the filing of an answer and affirmative defense by the plaintiff Bruno. By April 3, 1979, the plaintiff had withdrawn his complaint against the commission for injunctive relief, and the trial was conducted on Crone's counterclaim. The trial court ordered that Crone be placed first on the list. The court held that the plaintiff, because of rule II (3), was not qualified to take the examination and that he was foreclosed from attacking the constitutionality of the rule. This court subsequently reversed that judgment, ruling that the trial court erred when it concluded that, on the basis of *Florentine* v. *Darien,* 142 Conn. 415, 428, 115 A.2d 328 (1955), the plaintiff could not challenge the rule. We opined that the record was not adequate for this court to determine the durational residency rule's constitutionality and that a determination as to its constitutionality must await the development, at the trial level, of a sufficiently complete record: "[T]he present record is deficient because it contains no evidence or factual determinations concerning the governmental interests advanced by the rule, the degree to which the means employed by the rule are tailored to achieve its legislative objectives, or the extent to which various rights of the plaintiff are affected by the rule." (Footnote omitted.) *Bruno* v. *Civil Service Commission,* supra, 251. Accordingly, we remanded the case to the trial court for further proceedings.[2]

On remand, the plaintiff, over strong objections by Crone, filed a substitute complaint naming both the commission and Crone as defendants. At the hearing before the state referee, the following governmental

---

[2] Although the commission participated at the trial upon remand, it has not appealed the decision of the trial court.

interests were advanced by the commission as compelling reasons in favor of the durational residency requirement:

"(a) The City would be deluged with candidates for civil service positions if the durational residency requirement was eliminated.

"(b) The durational residency requirement promotes an ethnic balance in the City of Bridgeport.

"(c) The durational residency requirement eliminates the necessity of selective recruitment which would be expensive.

"(d) Residents who satisfy the durational residency requirement are more apt to take an interest in the affairs of the City of Bridgeport.

"(e) The rule promotes general economic benefits to the City of Bridgeport.

"(f) The rule helps to reduce high unemployment among inner city minority groups.

"(g) The rule is beneficial in developing improved relations between city employees and community groups.

"(h) The rule enhances the quality of employee performance because of greater knowledge by the employees of the city and its conditions.

"(i) The rule diminishes absenteeism and tardiness of city employees."

In regard to the above-cited contentions of the commission, the court found the following facts:

"1. Under the Civil Service Rules, employees are required to maintain a bona fide residency within the limits of the City after their appointment to a tenured position.

"2. Minorities taking civil service examinations are protected against discrimination by the manner in

which examinations are designed, constructed and validated under the EEOC and by Title No. 7 of the 1964 Civil Rights Act.

"3. There are no studies or surveys available to support the opinion of the Personnel Director or his assistant that the elimination of the durational residency requirement would cause a dilution in the number of minority applicants for civil service positions or non-minority applicants.

"4. There are no studies or surveys available showing the numbers of unemployed within the inner city minority groups in Bridgeport.

"5. It is not known whether the Personnel Director or his assistant utilized United States Census figures in noticing the examination in question.

"6. The census figures indicate the percentage of minorities in the City of Bridgeport and the Greater Bridgeport Metropolitan area.

"7. Recruiting for the position of recreation superintendent could have been accomplished by recruiting solely within the City of Bridgeport.

"8. There is no basis for the proposition that a durational waiting period has a positive impact on relations between city employees and community groups.

"9. Civic interest on the part of city employees can be accomplished by the bona fide residency rule as distinguished from the durational residency requirement.

"10. The durational residency requirement excludes non-residents interested in a position, interested in the affairs of the City and who know the City and the various communities within it.

"11. General economic benefits accrue to the City by employment and enforcement of the bona fide residency rule after appointment rather than from the operational effect of the durational residency rule.

"12. No studies or surveys are available indicating that there would be an impact on unemployment within the City of Bridgeport if nonresidents were permitted to take an examination, certified to a position and then required to maintain a bona fide residence within the City.

"13. No studies or surveys are available which indicate that the durational residency requirement will reduce absenteeism and tardiness among municipal employees. The governmental interest is adequately protected by enforcement of the bona fide residency rule.

"14. The durational residency rule is not helpful to the City in finding the best qualified applicants for the civil service position of a recreation superintendent.

"15. There is no reason why a Stratford resident would be less capable in serving in the position of recreation superintendent than a Bridgeport resident."

It was on the basis of these findings of facts that the trial court concluded that the classification created by rule II (3) touched upon a fundamental right of the plaintiff to travel either within or outside the state. Therefore, the court, citing *Shapiro* v. *Thompson,* 394 U.S. 618, 634, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969), reasoned that rule II (3) would be unconstitutional unless the state could demonstrate a compelling governmental interest to justify the law. After examining the reasons advanced by the commission, the court concluded that "they [the commission] cannot satisfy the heavy burden placed on the City to show a compelling state interest or a rational basis for the rule." Judgment was thus rendered in favor of the plaintiff decreeing that rule II (3) was violative of the equal protection provision of the constitution of the United States. It is from this decision that Crone appeals.

On appeal, Crone argues that the trial court erred for the following reasons: (1) the plaintiff lacked standing to challenge the constitutionality of the durational residency requirement, and (2) rule II (3) was not violative of the equal protection clause of the United States constitution.

We begin by examining the standing issue. Crone insists that the trial court erred in its conclusion that this court had accorded standing to the plaintiff in *Bruno I* to address the constitutionality issue. He argues that even though this court remanded the case for further proceedings, it was incumbent upon the plaintiff to prove, ab initio, that he had the requisite standing to proceed on remand. We disagree.

" 'It is the duty of the trial court on remand to comply strictly with the mandate of the appellate court according to its true intent and meaning . . . . The trial court should examine the mandate and *the opinion of the reviewing court and proceed in conformity with the views expressed therein.'* (Emphasis added.) *Nowell* v. *Nowell,* [163 Conn. 116, 302 A.2d 260 (1972)]." *Wendland* v. *Ridgefield Construction Services, Inc.,* 190 Conn. 791, 795, 462 A.2d 1043 (1983). We concluded in *Bruno I* that the question involved was whether "the plaintiff [can] attack the constitutionality of rule II (3) and, if so, is the record before us sufficiently complete to determine whether the rule is constitutionally defective?" *Bruno* v. *Civil Service Commission,* supra, 249. We further decided that "[a]s a result of the trial court's erroneous resolution of this issue . . . he [Bruno] is not foreclosed from attacking the constitutionality of the rule in this action." Id., 250. Indeed, although the brief of Crone in *Bruno I* explicitly emphasized that the plaintiff lacked standing, we decided the standing issue in favor of the plaintiff. "As far as the claims of counsel . . . are concerned . . . the printed briefs are largely the basis upon which the

judge works." Maltbie, Conn. App. Proc. § 327. Furthermore, after this court's decision in *Bruno I*, Crone moved to reargue, again maintaining that the plaintiff lacked standing to attack the constitutionality of the durational aspect of the residency requirement. We denied this motion on June 4, 1981. Implicit in our opinion in *Bruno I*, especially in view of our remand for further proceedings, is the fact that the issue of standing was resolved. To conclude otherwise would be equivalent to ordering further useless proceedings.

It was on the basis of the foregoing finding of facts that the trial court reached the conclusions which are the subject of Crone's second assignment of error. These conclusions were (in addition to the conclusion that the plaintiff had standing, which ruling we have already discussed) that the right to travel is a fundamental right, that rule II (3) penalized the right to travel and therefore requires strict judicial scrutiny, and that rule II (3) is violative of the equal protection clause of the United States constitution since it " 'clearly is not precisely drawn to achieve those purposes [of allocating public employment to bona fide residents and thus favors unemployed residents] with the least drastic burden' on the right to travel."

The conclusions of the trial court are tested by a finding. *Roby* v. *Connecticut General Life Ins. Co.*, 166 Conn. 395, 397, 349 A.2d 838 (1974). "A finding is to be read to uphold the judgment. Every reasonable presumption will be indulged in to support it." Maltbie, Conn. App. Proc. § 135. Therefore, the conclusions of the trial court must stand unless they are legally or logically inconsistent with the facts found or they involve the application of some erroneous rule of law material to the case. *Klein* v. *Chatfield*, 166 Conn. 76, 80, 347 A.2d 58 (1974). With this precept in mind, we examine those conclusions dealing with constitutional

interpretation, the test applicable to that interpretation, and the equal protection provision of the United States constitution.

In order to determine whether a statutory scheme violates the equal protection clause, a court must consider three factors: "the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification." *Dunn* v. *Blumstein,* 405 U.S. 330, 335, 92 S. Ct. 995, 31 L. Ed. 2d 274 (1972). The analysis must "commence with a determination of whether a legislative classification . . . impinges upon a fundamental right. Where the legislation impinges upon a fundamental right . . . it must be struck down unless justified by a compelling state interest." Id., 342; see also *Horton* v. *Meskill,* 172 Conn. 615, 639–40, 376 A.2d 359 (1977).

The trial court in this case concluded that the durational residency requirement of rule II (3) infringed on the plaintiff's fundamental right to travel:[3] "In moving initially from Bridgeport to Stratford for the betterment of his style of living and to promote an alleged better education for his children, Bruno was exercising a constitutional right . . . ." We agree with the trial court that rule II (3) penalized the plaintiff's exercise of his right to travel in this case.

---

[3] The plaintiff also argues that his fundamental right to public employment is violated by rule II (3). The United States Supreme Court in *Massachusetts Board of Retirement* v. *Murgia,* 427 U.S. 307, 96 S. Ct. 2562, 49 L. Ed. 2d 520 (1976), has held that the right of government employment is not a fundamental right requiring strict scrutiny. *"Murgia* does not preclude strict scrutiny, however, where public employment hinges on a durational residence requirement. Since the right to travel is affected, the specific interest restricted by such requirements need not itself be a fundamental right for strict scrutiny to be triggered." Lee, "Durational Residence Requirements for Public Employment," 67 Cal. L. Rev. 386, 394–95 (1979). Consequently, our analysis in this opinion will focus solely on the right to travel.

The right to travel has long been recognized and protected as a fundamental right which is firmly established in the law. See *Massachusetts Board of Retirement* v. *Murgia,* 427 U.S. 307, 312, 96 S. Ct. 2562, 49 L. Ed. 2d 520 (1976); *United States* v. *Guest,* 383 U.S. 745, 757, 86 S. Ct. 1170, 16 L. Ed. 2d 239 (1966). It is a right which the courts have repeatedly protected in the face of durational residency requirements that affect that right. See *Memorial Hospital* v. *Maricopa County,* 415 U.S. 250, 94 S. Ct. 1076, 39 L. Ed. 2d 306 (1974); *Dunn* v. *Blumstein,* supra; *Shapiro* v. *Thompson,* 394 U.S. 618, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969). Writing for the court in *Shapiro* v. *Thompson,* Justice Brennan cited with approval the decision of Chief Justice Taney in the *Passenger* cases, 48 U.S. (7 How.) 283, 492, 12 L. Ed. 702 (1849), as follows: "For all the great purposes for which the Federal government was formed, we are one people, with one common country. We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States." *Shapiro* v. *Thompson,* supra, 630.

The defendant in this case recognizes the existence of a protected right to travel, but argues that the right is not implicated in this case since it is only *inter*state and not *intra*state travel which has been elevated to the level of a fundamental right. He maintains that since the only travel involved in this case concerns the plaintiff's move in 1972 from Bridgeport, Connecticut to Stratford, Connecticut, this court should reject the claimed right to intrastate travel. We disagree.

We find our thinking to be substantially in accord with the decision of the United States Court of Appeals for the Second Circuit in *King* v. *New Rochelle Municipal Housing Authority,* 442 F.2d 646, 648 (2d Cir.), cert. denied, 404 U.S. 863, 92 S. Ct. 113, 30 L. Ed. 2d

107 (1971). The court in *King* considered a five-year durational residency requirement for admission to public housing. The appellant municipality argued that the United States Supreme Court decisions on the issue of durational residency protected only the fundamental right to interstate travel. Protecting the plaintiff's right to intrastate travel, the court concluded that "it would be meaningless to describe the right to travel between states as the fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state." Id., 648. Furthermore, the way to the recognition of an intrastate right to travel within Connecticut has already been considered in *Nicholls* v. *Schaffer,* 344 F. Sup. 238 (D. Conn. 1972). In *Nicholls,* the United States District Court considered a constitutional attack on a statutory requirement in a six-month durational residency requirement which, if not complied with, prohibited the plaintiffs' right to register to vote in town elections. The "travel" involved in the case was intrastate travel; the plaintiffs were denied the right to register to vote in Hartford after they moved there from West Hartford. The court declared the requirement invalid as a denial of equal protection, quoting a comment made by Justice Marshall in *Dunn* v. *Blumstein,* supra, 342: "[S]uch laws [with durational residency requirements] force a person who wishes to travel and change residences to choose between travel and the basic right to vote . . . . Absent a compelling state interest, a State may not burden the right to travel in this way." Implicit in this *Nicholls* decision was the recognition by the court of a fundamental right to intrastate travel, a right we now explicitly recognize.

Crone also argues that the plaintiff's right to travel was not infringed since there is no required "classification" in this case. Citing *Shapiro* v. *Thompson,* supra, *Dunn* v. *Blumstein,* supra, and *Memorial Hospital* v.

*Maricopa County,* supra, he maintains that at the crux of any equal protection argument is the "classification" existing at the time of the alleged violation. In each of these cited cases, the "classification" which existed involved two classes of residents, new and old, indistinguishable from one another except for the length of time that each was a resident. The equal protection challenge to the classification in question was raised by those who had recently exercised their right to travel during the relevant time period. In each case, the plaintiff was denied benefits simply because of the length of time he was a resident. Thus, the same class (residents) was treated differently because the new residents had recently traveled. If these plaintiffs had not traveled, there could have been no claim of infringement on the right to travel. Crone contends that since the plaintiff in the present case did not travel during the qualifying one year period, no invidious classification denying him the right to travel exists; therefore, no penalty on the plaintiff's right to travel has been incurred. We disagree.

The trial court held that the "failure of the Personnel director to notice and give a promotional examination for the position of recreation superintendent . . . placed him in a class which is adversely affected by Rule II (3) . . . ." Evidence was offered at trial which showed that the examination for recreation superintendent in 1976 could have and should have been noticed as a promotional examination with no durational residency requirement, which the plaintiff was eligible to take. Section 9 of the civil service rules provided that in instances where there was an opening in a superior class, "the examination *shall* be opened to those in an inferior rank in the same class . . . ." (Emphasis added.) There was testimony at trial from the personnel director for the city of Bridgeport, whose duty it was to administer the civil service rules and regulations,

that a promotional examination does not require durational residency; that the position of recreation superintendent was of a rank or grade which was superior to that held by the plaintiff at the time; that examinations for this or a similar position were uniformly noticed as promotional examinations in the past; and that there were sufficient members of the recreation department or class, including the plaintiff, who were eligible to take a promotional examination. Nonetheless, the examination in question was noticed as an open, competitive examination containing a durational residency requirement as found in rule II (3) of the civil service rules. Further evidence showed that the examination in issue was noticed on this basis and with a durational residency requirement as a preference to one individual who was a favorite of the Bridgeport park board. We agree with the trial court that the plaintiff was a member of a class of employees who aspired to be promoted to a superior position. Since this "classification" does exist, the plaintiff is one such member entitled to pursue his equal protection claim in this case.

Since we have concluded that a fundamental right is implicated in this case, the state's action is not entitled to its usual presumption of validity. "Strict judicial scrutiny" requires that the state rather than the complainants carry the "heavy burden of justification."[4] It is insufficient to show that the classification is merely " 'reasonably related to a permissible state interest' or merely rational." *Fasulo* v. *Arafeh*, 173 Conn. 473, 488, 378 A.2d 553 (1977), quoting *Dunn* v.

---

[4] Recognizing this requirement, the trial court allowed the plaintiff to file a substitute complaint against both Crone and the commission, in effect nullifying the previous withdrawal of the action against the commission. The transcript indicates that the referee would not consider the substitute complaint, stating that he would follow the remand, being solely concerned with the question of constitutionality. We glean that this is the reason that the commission played a vital role in the examination of witnesses and arguments to the court.

*Blumstein,* supra. Rather, any such statute must be drawn with "precision," "tailored" to serve legitimate objectives; should a second route exist which is less offensive to constitutionally protected rights, then that route must be chosen. *Dunn* v. *Blumstein,* supra.

The court below examined the reasons advanced by the commission in favor of rule II (3) to determine whether they satisfied the required test. The court concluded that the majority of the proposed interests; including claims that unemployment would be reduced, that relations between city employees and community groups would be enhanced, that selective recruitment is expensive to the city, that general economic benefits would accrue to the city, and that absenteeism would be reduced among city employees; was "not supported by logic, reason or experience. A perusal of the transcript discloses not one specific example or documented case in Bridgeport to support [any] such claim and therefore the conclusion is inevitable that they are illusory . . . ." The commission had the burden of presenting the evidence including, if necessary, the burden of supplying the documents and figures relied upon. Since the commission failed to substantiate many of its suggested interests, the court was correct in holding that a compelling state interest was not advanced in favor of rule II (3).

As for certain other interests advanced by the commission, the trial court found that there were alternatives available which were less offensive than the durational residency rule. As to the claim that residents who satisfy rule II (3) are more likely to take an interest in community affairs, the court concluded that a residency rule requiring the maintenance of a bona fide residence *after* appointment would lead to the desired result. Furthermore, the court found that "[a]lthough the durational residency rule may have a rational relationship to the purpose of allocating public employment

to bona fide residents and thus favor unemployed residents, it 'clearly is not precisely drawn to achieve those purposes with the least drastic burden on the right to travel.' "

We agree that the means employed by the commission are certainly not the least drastic means available; there exist other means which accomplish the result without infringing upon individual liberties. For example, if prospective candidates must be acquainted with the city, and this is of legitimate concern to the city, then those candidates may be tested as to their familarity with the city and its communities. This can be done with nonresidents as well. If it is important to develop relations between city employees and citizens, then the employee may be required to live within the geographical confines of the city while that employee holds municipal employment. If absenteeism or tardiness are the issues, the employee could be required to live in the city while he holds the job. This is true also for any economic benefit inuring to the city while the employee holds the civil service job. These varied interests would be insured through enforcement of a *bona fide* residency requirement rather than a *durational* one.

Accordingly, we conclude that the trial court correctly held that the right to travel freely within the state of Connecticut is a fundamental right and that the durational residency requirement of rule II (3) cannot pass the test of "strict judicial scrutiny." The lengthy finding of facts by the trial court supports the conclusion that rule II (3) is violative of the equal protection clause of the United States constitution and is, therefore, invalid.

There is no error.

In this opinion HEALEY and DALY, Js., concurred.

SHEA, J. (concurring). I agree with the result.

In view of the findings of the trial court that the examination should have been noticed as a promotional examination with no durational residency requirement and that the pertinent civil service rules were not followed in order to give a preference to one individual who was a favorite of the Bridgeport park board, I would not reach the constitutional issues in respect to either standing or substance. We do not ordinarily hold a statute or ordinance unconstitutional where there is a sufficient nonconstitutional ground for disposing of the case. "Constitutional issues are not considered unless absolutely necessary to the decision of a case." *State* v. *Onofrio,* 179 Conn. 23, 37–38, 425 A.2d 560 (1979), quoting *State* v. *DellaCamera,* 166 Conn. 557, 353 A.2d 750 (1974); see also *Ashwander* v. *Tennessee Valley Authority,* 297 U.S. 288, 346–47, 56 S. Ct. 466, 80 L. Ed. 688 (1936) (Brandeis, J., concurring); *Pi* v. *Delta,* 175 Conn. 527, 534, 400 A.2d 709 (1978).

Although in *Bruno I* the case was remanded because there was not a sufficient trial record on the constitutional issue, the rescript "for further proceedings according to law" did not limit the trial court and the issue of noncompliance with the civil service rules was actually tried and decided.

In this opinion PARSKEY, J., concurred.