I INTRODUCTION
Since 1897, the charter of the city of New Haven (charter) has provided that, the mayor of the city "shall have been a legal voter in and resident of the city for at least five years immediately preceding said mayor's election." New Haven City Charter art. V, § 10 (a); 12 Spec. Acts 1115, No. 418, § 10 (1897). The question presented by the motion now before the court is whether this provision comports with the equal protection clauses of the state and federal constitutions.
The facts are not in dispute. The plaintiff, Joel Schiavone, is a well known business executive in the city of New Haven (city). He was educated at Yale University and has lived in the city for more than fifteen years. At one point, he changed his residence to another town, but he moved back to the city on October 1, 1999, and has been a legal voter in and resident of the city since that date. He has declared his candidacy for mayor of the city. The city will hold its next regular mayoral election on November 6, 2001. Id., art. IV, § 9. If Schiavone should be elected, however, he would not be eligible to serve since he would, on November 6, 2001, have been a legal voter in and resident of the city for just slightly more than two years immediately preceding the election.
Schiavone commenced this action by service of process on October 6, 2000. He is the sole plaintiff. The defendants are: John DeStefano, the present mayor of the city; the board of aldermen of the city; and, the city. (The defendants will be collectively referred to as the city.)
Schiavone's complaint consists of a single count. It alleges that the charter requirement that the mayor "shall have been a legal voter in and resident of the *Page 523 
city for at least five years immediately preceding said mayor's election" violates his rights under "Articles First and Fifth as well as [the] Fifth
and Fourteenth Amendments to the United States Constitution as well as Article First, Section 20, Article Sixth, Section 10 and Article Tenth, Section 1 of the Constitution of the State of Connecticut." It asks for a declaratory judgment that article V, § 10, of the charter is unconstitutional and an injunction directing the defendants "to cease implementing the residency requirement" of that provision.
On December 7, 2000, Schiavone filed the motion for summary judgment now before the court. The motion requests the relief sought in the complaint.
The motion was heard on January 25, 2001. The issues before the court were significantly refined at the hearing. Schiavone has confined his argument to reliance on three constitutional provisions: (1) the equal protection clause of the federal constitution, U.S. Const., amend. XIV, §1; (2) the equal protection guarantee of the state constitution, Conn. Const., art. I, § 20 (now amended by Conn. Const., amend. XXI); and (3) the privileges and immunities clause of the federal constitution, U.S. Const., amend. XIV, § 1. The remaining constitutional arguments referred to in the complaint and the motion have been abandoned. Schiavone additionally made it clear that he does not object to the charter's requirement that the mayor "shall reside in the city during the term of office. . . ." New Haven City Charter art. V, § 10 (a). It is, finally, clear from the undisputed facts of the case that Schiavone's argument need not extend to an attack on any durational residency requirement for the office of mayor. As mentioned, Schiavone will have been a legal voter in and resident of the city for over two years at the time of the next mayoral election. His attack is leveled at the five year requirement contained in article V, § 10 (a), of the charter. *Page 524 
The city, for its part, has agreed that no material facts are in dispute and that all necessary persons have been notified and joined as parties in the action. No motion to strike for nonjoinder or failure to give notice to interested persons has been filed. See Practice Book § 17-56 (c). Although the case has received considerable local publicity, no other person has moved to join the action. Under these circumstances, it is appropriate to consider the legal issues presented.
 II STANDING
The city initially contends, without citation of authority, that Schiavone lacks standing to pursue his claim. The city contends that nothing prevents Schiavone from campaigning for the office of mayor and that he will be in no position to litigate against the charter provision in question until such time, if ever, that he is actually elected. This argument is unpersuasive. Our Supreme Court has recently explained that: "Standing is . . . a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of direct injury [that the complainant] has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy." (Internal quotation marks omitted.) Connecticut Associated Builders Contractors v. Hartford,251 Conn. 169, 178, 740 A.2d 813 (1999). The necessary "personal stake in the outcome of the controversy" manifestly exists here. Running for office is an expensive and time consuming *Page 525 
business. A candidate seeking office not knowing whether he would be eligible to serve if elected would be quixotic indeed. Numerous courts, in cases to be discussed in this opinion, have considered the merits of durational residency requirement cases brought by would be candidates. Schiavone has a substantial personal stake in the outcome of this action. This case plainly involves a "hot controversy, with each view fairly and vigorously represented."
The city additionally contends, again without citation of authority, that Schiavone lacks standing to litigate his claim because he was a member of a recent charter revision commission which did not recommend that the durational residency requirement in question be amended. How such membership precludes Schiavone from pressing his claim in court is not explained. The city makes no suggestion that Schiavone himself has at any time supported the provision that he now attacks. Schiavone is not responsible for the creation of the requirement — which, as mentioned, dates from 1897. Such membership in no way reduces Schiavone's stake in the outcome of the controversy. In fact, the city's argument serves to underscore Schiavone's stake in the controversy by citing his involvement in the city's civic and political life. Under these circumstances, it is appropriate to proceed to the merits.
 III THE PROBLEM
The problem with the durational residency requirement at issue here is that it reduces the pool of candidates from which the voters may choose in a way that is difficult to justify in a modern democracy. The world has recently witnessed the drama of a political candidate acquiring residence in a new state and subsequently being elected by the voters of that state to the United States Senate in the course of a single calendar *Page 526 
year. The New Haven charter provision in question categorically precludes a mayoral version of such a candidacy no matter how worthy thecandidate. The charter's classification is difficult to justify either with respect to its "legal voter" requirement or its durational residency requirement.
The charter requires the mayor to have been "a legal voter" in the city for five years. Yet, as the city conceded at argument, there is no requirement that a successful candidate have actually cast a single vote in any of those years. Consider two hypothetical candidates, Smith and Jones. Smith has lived in the city for five years. He has been registered to vote throughout this period but has never bothered to cast a single vote. Jones moved into the city four years ago and has conscientiously voted in every election since. How can the government in a modern democracy say that Smith is qualified to be mayor and Jones is not?
The durational residency requirement is even more arbitrary in its working. Suppose that Smith moved to New Haven from Tibet five years ago. He rents an apartment in New Haven but has commuted to New York every day. Jones, on the other hand, has lived in New Haven for most of his life, but five years ago he moved one block across the border to Hamden and resided there for a year before moving back. Throughout this period, Jones has worked in New Haven every day. Once again, how can the government in a modern democracy say that Smith is qualified to be mayor and Jones is not? More importantly, how can the government in a modern democracy preclude the voters from deciding which is the more qualified candidate? These are questions that courts in a modern constitutional democracy cannot ignore. *Page 527 
 IV THE PRIVILEGES AND IMMUNITIES CLAUSE
One of Schiavone's arguments provides no solution to this problem. Schiavone contends that the durational residency requirement in question violates the privileges and immunities clause of § 1 of the fourteenth
amendment to the United States constitution. The principal case upon which he relies explains, however, that the privileges and immunities clause involves "a nonresident's exercise of the right to move into another State and become a resident of that State." Saenz v. Roe,526 U.S. 489, 502, 119 S. Ct. 1518, 143 L. Ed. 2d 689 (1999). Schiavone's travels have been within the state of Connecticut. The durational residency requirement at issue here discriminates equally against those who have previously resided elsewhere within the state of Connecticut and those who have previously resided in other states. This case has nothing to do with an attempt by a state to select its citizens. Id., 511. Nor has the city made any attempt to distinguish between Connecticut citizens and citizens of other states. Unless they have resided within the city for five years, Connecticut residents and out-of-state residents are all cast out to sea in the same boat. Schiavone's argument that the privileges and immunities clause has been violated here fails on its own terms.
 V THE FEDERAL EQUAL PROTECTION CLAUSE
Schiavone's federal equal protection argument would be forceful if the question were an open one in terms of federal constitutional law. That, however, is not the case. Slightly more than a quarter of a century ago, the United States Supreme Court issued two per curiam affirmances that, as a practical matter, foreclose the federal constitutional issue until such time that the *Page 528 
court, changes its mind. Sununu v. Stark, 420 U.S. 958, 95 S. Ct. 1346,43 L. Ed. 2d 435 (1975), aff'g 383 F. Sup. 1287 (D.N.H. 1974);Chimento v. Stark, 414 U.S. 802, 94 S. Ct. 125, 38 L. Ed. 2d 39 (1973), aff'g 353 F. Sup. 1211 (D.N.H. 1973). Sununu and Chimento upheld New Hampshire constitutional provisions setting forth seven year durational residency requirements as conditions of eligibility for the offices of state senator and governor, respectively. Although municipal offices are arguably distinguishable from the offices in question in Sununu andChimento, an influential Sixth Circuit Court of Appeals decision, now two decades old, held that federal equal protection challenges to durational residency requirements for municipal office are foreclosed by those Supreme Court decisions. Akron v. Bell, 660 F.2d 166, 168 (6th Cir. 1981) (upholding a municipal one year residential requirement for ward councilman candidates); see also Billing ton v. Hayduk, 565 F.2d 824, 826
(2d Cir. 1977) (expressing "grave doubt" as to whether a federal equal protection challenge to a five year durational residency requirement for county executive is not foreclosed by Sununu and Chimento). Since Akron, no federal court has struck down a durational residency requirement for political office. I agree with the city that, until such time as the Supreme Court changes its mind, lower courts are not free to invalidate such requirements (unless those requirements exceed seven years) on federal equal protection grounds. Under these circumstances, Schiavone's federal equal protection argument must fail before this court.
 VI THE STATE EQUAL PROTECTION GUARANTEE A Factors Calling for an Independent Analysis of State Constitutional Law
Although the Connecticut Supreme Court often consults federal case law in construing Connecticut's equal *Page 529 
protection guarantee, it has recognized that, "In appropriate circumstances, we have interpreted the equal protection provisions of the state constitution differently than that contained in the federal constitution, particularly when the distinctive language of our constitution calls for an independent construction." Daly v. DelPonte,225 Conn. 499, 513, 624 A.2d 876 (1993).
Lower courts do not ordinarily determine that the federal and state equal protection guarantees should be differently construed. The case presented here, however, contains four exceedingly unusual features which, when considered together, require systematic consideration of Schiavone's state constitutional claim. First, the controlling federal equal protection law is established only by the comparatively thin reed of per curiam affirmances rather than by a considered opinion of the United States Supreme Court. Second, the rationales of these now somewhat dated affirmances are, as will be explained in a moment, in significant tension with the reasoning of the court's recent opinions concerning the rights of candidates and voters, leaving considerable doubt that the court would reach the same conclusion if it were to now consider the matter anew. Third, Schiavone's argument is consistent with the relevant equal protection jurisprudence of the Connecticut Supreme Court. Finally, the distinctive language of the Connecticut constitution, as well as distinctive characteristics of Connecticut civic and political life, call for an independent construction of Connecticut's equal protection clause.
 B The Geisler Factors
The form that a separate analysis of Connecticut constitutional law must take is well established: "In order to construe the contours of our state constitution and reach reasoned and principled results, the following *Page 530 
tools of analysis should be considered to the extent applicable: (1) thetextual approach . . . (2) holdings and dicta of this court and theAppellate Court . . . (3) federal precedent . . . (4) sister statedecisions or sibling approach . . . (5) the historical approach, including the historical constitutional setting and the debates of the framers . . . and (6) economic/sociological considerations." (Citations omitted; emphasis in original.) State v. Geisler, 222 Conn. 672, 684-85,610 A.2d 1225 (1992); accord State v. Glenn, 251 Conn. 567, 571-72,740 A.2d 856 (1999). The Geisler factors must now be considered in turn.
 1 The Textual Approach
Connecticut's equal protection guarantee, now embodied in Conn. Const., amend. XXI, provides that, "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability." This text is considerably more elaborate than that of U.S. Const., amend. XIV, § 1, which provides, more simply, that no state shall "deny to any person within its jurisdiction the equal protection of the laws." Much of the textual difference is unimportant here. Schiavone does not claim discrimination because of religion, race, color, ancestry, national origin, sex or physical or mental disability. Two textual differences are, however, important. First, the textual emphasis of the Connecticut constitutional provision is on the person discriminated against ("[n]o person shall be denied the equal protection of the law") rather than on the entity forbidden from discriminating (in the case of the federal constitution, the "State"). Second, the Connecticut constitutional provision expressly refers to the exercise *Page 531 
of "political rights" as a core political right worthy of protection.
With its express reference to "political rights" in mind, Connecticut's equal protection guarantee can appropriately be construed with reference to several other distinctive guarantees of political rights contained in the Connecticut constitution. See A. Amar, "Intratextualism," 112 Harv. L. Rev. 748 (1999). The preamble to the Connecticut constitution invokes the principle of "free government." The separate preamble to Conn. Const., art. I, states that the declaration of rights contained in that article is promulgated "[t]hat the great and essential principles of liberty and free government may be recognized and established." Conn. Const., art. I, § 1, provides that, "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community." Finally, Conn. Const., art. I, § 2, provides that, "All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit. . . ." The "political rights" safeguarded by Connecticut's equal protection guarantee must be construed with these repeated textual references to "free government" and the equality of persons engaged in political activity in mind. These references are particularly important in light of the fact that, as will be seen, the right of a candidate to run for office is inextricably bound up with the right of voters to vote for the candidate of their choice.
Significantly, the Connecticut constitution imposes no durational residency requirements on elected officials. The governor, for example, need only be "an elector of the state" (in addition to being at least thirty years old). Conn. Const., art. IV, § 5. State senators and representatives need only be electors currently residing in their respective districts. Id., art. III, §§ 3 and 4. The *Page 532 
Connecticut constitution imposes no qualifications on elected municipal officers.
 2 Holdings and Dicta of the Connecticut Supreme Court Bruno v. Civil Service Commission, 192 Conn. 335, 472 A.2d 328 (1984), is highly relevant. Bruno invalidated a requirement that a candidate for recreation superintendent of the city of Bridgeport have been a resident of that city for one year prior to his civil service examination. The court reasoned: "In order to determine whether a statutory scheme violates the equal protection clause, a court must consider three factors: `the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification.' Dunn v. Blumstein,405 U.S. 330, 335, 92 S. Ct. 995, 31 L. Ed. 2d 274 (1972). The analysis must `commence with a determination of whether a legislative classification . . . impinges upon a fundamental right. Where the legislation impinges upon a fundamental right . . . it must be struck down unless justified by a compelling state interest.' Id., 342; see alsoHorton v. Meskill, 172 Conn. 615, 639-40, 376 A.2d 359 (1977)." Bruno v.Civil Service Commission, supra, 345. Bruno concluded that Bridgeport's durational residency requirement "infringed on the plaintiffs fundamental right to travel." Id. It found that the plaintiffs residential move from Bridgeport, to Stratford had implicated this right. Id., 346. QuotingKing v. New Rochelle Municipal Housing Authority, 442 F.2d 646, 648 (2d Cir.), cert. denied, 404 U.S. 863, 92 S. Ct. 113, 30 L. Ed. 2d 107
(1971), the court reasoned that "`it would be meaningless to describe the right to travel between states as the fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state.'" Bruno v. Civil Service Commission, *Page 533 
supra, 347. The court thus "explicitly" recognized "a fundamental right to intrastate travel." Id. Given this analysis, the court explained, it was irrelevant that the plaintiff had no fundamental right to government employment. "Since the right to travel is affected, the specific interest restricted by such requirements need not itself be a fundamental right for strict scrutiny to be triggered." (Internal quotation marks omitted.) Id., 345 n. 3. The court further explained that, in these circumstances, the constitution requires that the classification "be drawn with `precision,' `tailored' to serve legitimate objectives; should a second route exist which is less offensive to constitutionally protected rights, then that route must be chosen." Id., 350.
The Connecticut Supreme Court has subsequently emphasized the distinction between durational residency requirements that impinge on the fundamental right of travel and bona fide residency requirements ascontinuing conditions of municipal employment, which present no analogous equal protection problems. Carofano v. Bridgeport, 196 Conn. 623, 638,495 A.2d 1011 (1985). This distinction is important here because Schiavone, a present New Haven resident, does not contest the charter provision requiring the mayor to reside in the city during his term. See also Leech v. Veterans' Bonus Division Appeals Board, 179 Conn. 311, 318,426 A.2d 289 (1979) (upholding veterans' bonus statute that did not require plaintiff to wait any given period of time to receive benefit);Hackett v. New Haven, 103 Conn. 157, 159, 130 A. 121 (1925) (construing New Haven charter provision requiring member of board of finance to be "a resident elector of the city"); Massed v. New London, 36 Conn. App. 584,587, 652 A.2d 529 (1995) (allowing municipality to bar present nonresident property owners from voting). Bruno remains good law, and subsequent Connecticut jurisprudence has only served to underscore the distinction *Page 534 
between durational residency requirements, which are constitutionally suspect, and bona fide residency requirements, which are not.
 3 Federal Precedent Bruno, as discussed, rests on federal precedent involving the right to travel. Judicial recognition of this right stretches from the PassengerCases, 48 U.S. (7 How.) 283, 12 L. Ed. 702 (1849), to Saenz, and the fundamental importance of this right in modern times is beyond dispute.Bruno, once again relying on federal precedent, extends the scope of this right to intrastate travel.
Sununu and Chimento, the United States Supreme Court precedents dealing with durational residency requirements for elective office, are, as mentioned, per curiam affirmances. "A summary disposition affirms only the judgment of the court below, and no more may be read into [that] action than was essential to sustain that judgment." (Internal quotation marks omitted.) Montana v. Crow Tribe of Indians, 523 U.S. 696, 714 n. 14, 118 S. Ct. 1650, 140 L. Ed. 2d 898 (1998). In the absence of an opinion, we do not know how the Supreme Court squared the holdings of those cases with the court's right to travel jurisprudence. The lower federal court in those cases found that the right to travel was implicated and proceeded to apply the compelling state interest test accordingly. Sununu v. Stark, supra, 383 F. Sup. 1290; Chimento v.Stark, supra, 353 F. Sup. 1214. The court reasoned that the residency requirements at issue passed the compelling interest test because they ensured exposure of elective officers to their political jurisdictions and prevented frivolous candidacies. It also reasoned that the requirements placed only a minimal infringement on the rights of the candidate since the candidate was free to wait seven *Page 535 
years and seek other positions in the interim period. Chimento v. Stark, supra, 1215-16.
With respect, this rationale falls well short of being compelling, certainly when applied to the sort of municipal office at issue here. The Smith and Jones hypothetical used earlier illustrate that durational residency requirements do not necessarily ensure exposure of elective officers to their political jurisdictions. Smith could live in New Haven and commute to New York, acquiring little knowledge of New Haven in the process. Jones could move from New Haven to Hamden and back again, working in New Haven throughout, and acquire a thorough knowledge of New Haven in the process. Whether the candidacies of either of these political aspirants are frivolous is a question appropriately left to the voters.
The notion that a substantial residency requirement acts as only a minimal infringement on the candidate inappropriately demeans the role of political candidacy in a democracy. Political candidacy in a democracy is more than a quest for a job. It is the battle of ideas in the public forum. Candidates are not fungible commodities. The annals of our democracy are full of men and women who used the triumph of ideas to shape a nation. The "minimal infringement" doctrine cannot withstand the test of history. Who would now tell Abraham Lincoln in 1860, "Wait five years before running for President; the wait will be a minimal infringement on your rights, and you can run for other office in the meantime?" Who would give a similar command to Franklin Roosevelt in 1932? Or (changing president to prime minister) to Winston Churchill in 1940? Viewed in the light of history, reasoning like this is unconvincing in the extreme. Political candidacy is essential to the working of the democratic state.
Madison recognized in The Federalist No. 57 that the rights of electors and candidates are inextricably bound *Page 536 
together. "Who are to be the objects of popular choice?" he asked. His answer was, "Every citizen whose merit may recommend him to the esteem and confidence of his country." J. Madison, "The Federalist" No. 57, reprinted in 2 The Debate on the Constitution (1993) p. 214. Madison's view was consistent with that of other prominent members of the founders' generation. See Powell v. McCormack, 395 U.S. 486, 540-41, 547-48,89 S. Ct. 1944, 23 L. Ed. 2d 491 (1969). Hamilton, for example, argued before the New York ratification convention that, "[T]he true principle of a republic is, that the people should choose whom they please to govern them. Representation is imperfect, in proportion as the current of popular favour is checked. — This great source of free government, popular election, should be perfectly pure, and the most unbounded liberty allowed." A. Hamilton, 2 The Debate on the Constitution, supra, p. 772. Paraphrasing Madison, Powell explains that, "[T]his principle is undermined as much by limiting whom the people can select as by limiting the franchise itself." Powell v. McCormack, supra, 547.
The Supreme Court has given these venerable democratic ideas a renewed vitality in recent years. Although the court has at times stated that there is no fundamental right to political candidacy — Bullock v. Carter,405 U.S. 134, 142-43, 92 S. Ct. 849, 31 L. Ed. 2d 92 (1972); seeClements v. Fashing, 457 U.S. 957, 963, 102 S. Ct. 2836, 73 L. Ed. 2d 508
(1982) (plurality opinion)"it has also recognized that, "[T]he rights of voters and the rights of candidates do not lend themselves to neat separation. . . ." Bullock v. Carter, supra, 143. A month after its decision in Bullock, the court held that durational residency requirements for voters are subject to strict judicial scrutiny. Dunn v.Blumstein, supra, 405 U.S. 336. The court has recently held, in an exceedingly well known case, that voting is a fundamental right. Bush v.Gore, 531 U.S. 98, 104, 121 S. Ct. 525, *Page 537 148 L. Ed. 2d 388 (2000). If, as Bullock tells us, the rights of voters are inextricably bound up with the rights of candidates, the right to seek political office is itself a right of vital importance in our democracy.
This logic underlies U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779,115 S. Ct. 1842, 131 L Ed. 2d 881 (1995). U.S. Term Limits, Inc., as is well known, invalidated a state constitutional provision prohibiting candidates for Congress from appearing on the general election ballot if they had already served three terms in the House of Representatives or two terms in the Senate. Although the formal constitutional argument in that case was fought on the battleground of the qualifications clauses; see U.S. Const., art. I, §§ 2 and 3; the Madisonian view of democracy played a vital supporting role. To the dissenters in U.S. Term Limits,Inc., there was no fundamental right to be a candidate, and the term limit restrictions in question were themselves a product of the democratic process. U.S. Term Limits, Inc. v. Thornton, supra, 878-79 (Thomas, J., dissenting). (The city makes just such an argument in the present case.) That restrictive view of candidacy did not prevail. To the majority, U.S. Teryn Limits, Inc., involved the "same `fundamental principle of our representative democracy' . . . recognized in Powell, namely, that `the people should choose whom they please to govern them.'" Id., 819. This means, as Timothy Pickering wrote in 1787, that the constitution "throws the door wide open for the entrance of every man who enjoys the confidence of his fellow citizens." (Emphasis in original.) T. Pickering, 1 The Debate on the Constitution, supra, pp. 290-91; U.S.Term Limits, Inc. v. Thornton, supra, 820. U.S. Term Limits, Inc., additionally recognizes a second "critical idea" underpinning our democracy: "that an aspect of sovereignty is the right of the people to vote for whom they wish." U.S. Term *Page 538 Limits, Inc. v. Thornton, supra, 820. There is, finally, "a third idea central to this basic principle: that the right to choose representatives belongs not to the States, but to the people." Id., 820-21. This idea, memorably articulated in Lincoln's Gettysburg Address, is implicit in the federal constitution. As mentioned, it is expressly enshrined in articlefirst, § 2, of the Connecticut constitution (providing that "[a]ll political power is inherent in the people").
The Supreme Court revisited some important aspects of the rights of citizenship in Bush. Bush, as is extremely well known, applies a rigorous equal protection analysis to the counting of ballots. "History," theBush court tells us, "has now favored the voter. . . ." Bush v. Gore, supra, 531 U.S. 104. "When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental. . . ." Id. The court additionally explains that, "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." Id., 104-105. Bush, unlike U.S. Term Limits,Inc., does not consider the rights of candidates, but its reasoning, based on fundamental notions of democracy, equality and citizenship, is plainly cut from U.S. Term Limits, Inc.'s bolt of constitutional cloth. If government may not, by arbitrary and disparate treatment, value one person's vote over another, it is difficult to see how it can, by arbitrary and disparate treatment, value one person's political candidacy over that of another.
U.S. Term Limits, Inc., and Bush provide striking evidence that the court's now dated per curiam affirmances in Sununu and Chimento do not provide the last (much less the most persuasive) analysis of the constitutional rights of candidates. In particular, state courts, attempting to construe state constitutional provisions in a reasoned way, can profitably look to U.S. *Page 539 Term Limits, Inc., and Bush, as well as the founders' statements that those decisions reflect, in articulating the fundamental principles of our democracy.
 4 Sister State Decisions
Alaska is the only sister state to have separately analyzed durational residency requirements for political candidates under its state constitution. The Alaska Supreme Court has drawn a distinction between one year durational residency requirements, on the one hand, and longer durational residency requirements, on the other. It approved a one year requirement for municipal office in Castner v. Homer, 598 P.2d 953
(Alaska 1979), but struck down a three year requirement in Peloza v.Freas, 871 P.2d 687 (Alaska 1994). The Peloza court was "inclined to consider problematic any period longer than one year." Id., 691 n. 8. It reasoned that "[w]e are not persuaded that ensuring familiarity between the electorate and candidates in a local election is sufficiently compelling to outweigh the significant burden the charter provision places on the fundamental rights at stake. And the longer the candidate has been in the community, the weaker the means-ends fit becomes. Three years is an unacceptably long time to burden the right of local voters to make their own decisions. Id., 691.
Numerous state courts have considered federal constitutional challenges to durational residency requirements for political candidates. J. Perovich, annot, Validity of Requirement that Candidate or Public Officer Have Been Resident of Governmental Unit for Specified Period, 65 A.L.R.3d 1048 (1975), cites the pre-Sununu authorities (federal as well as state). The annotation notes that "[t]he length of the required residence has frequently been a critical factor in the court's determination." Id., 1056. Zeilenga v. Nelson, 4 Cal. 3d 716, *Page 540 484 P.2d 578, 94 Cal. Rptr. 602 (1971), is the most pertinent pre-Sununu authority. Zeilenga invalidates a five year residency requirement for the position of county supervisor. It reasons that: "Perhaps in the horse and buggy days the five-year requirement could have been reasonable, but in these days of modern public transportation, the automobile, newspapers, radio, television, and the rapid dissemination of news throughout all parts of the county, the requirement is unreasonable. It excludes certain citizens from public office by a classification which is unnecessary to promote a compelling governmental interest. It is a built-in device to prevent competition against the county's oldtimers for the office of supervisor. Nowhere is it shown that a candidate for the office of supervisor cannot acquire competent knowledge of the county's conditions in much less than five years to qualify him for the office, at least sufficiently to submit to the voters for their choice his knowledge thereof." Id., 722; see Bird v. ColoradoSprings, 181 Colo. 141, 507 P.2d 1099 (1973) (invalidating five year residency requirement for office of mayor or councilman with citation ofZeilenga).
Matthews v. Atlantic City, 84 N.J. 153, 417 A.2d 1011 (1980), is an instructive post-Sununu case invalidating a two year residency requirement for the office of city commissioner. Matthews held that the residency requirement in question violated equal protection because it was applicable to only a small number of municipalities and treated municipalities with commission governments differently from other local governments. Matthews devotes much attention to the principles of democratic government discussed elsewhere in this opinion. It reasons that, because a durational residency requirement imposed on candidates necessarily affects the interests of the voter, "something more than mere rationality is required to support the requirement." Id., 168-69. Instead, "a requirement or *Page 541 
restriction for candidates for elective office must be reasonably and suitably tailored to further legitimate governmental objectives." Id., 169. Because Matthews invalidated the requirement before it on geographic distribution grounds, it did not review the validity of more generally applied two year requirements with reference to this test.
Several other state courts, acting in the post-Sununu era, have rejected federal equal protection challenges to durational residency requirements imposed on political candidates. Mobley v. Armstrong,978 S.W.2d 307 (Ky. 1998) (affirming two year residency requirement for district judges); Rivera v. Erie County Board of Elections, 164 A.D.2d 976,560 N.Y.S.2d 536 (affirming one year residency requirement for common council), leave to appeal denied, 76 N.Y.2d 705, 560 N.Y.S.2d 128,559 N.E.2d 1287 (1990); State ex rel. Brown v. Summit County Board ofElections, 46 Ohio St. 3d 166, 545 N.E.2d 256 (1989) (affirming two-year residency requirement for city council); White v. Manchin, 173 W. Va. 526,318 S.E.2d 470 (1984) (affirming one year residential requirement for state senator). These cases have involved relatively brief residency requirements. In any event, for reasons already discussed, the federal constitutional argument involving durational residency requirements for political candidates is foreclosed by Chimento and Sununu. However, state courts, construing state constitutional provisions, can appropriately recognize the fact that lengthy durational residency requirements are more problematic than brief residency requirements under existing state court jurisprudence.
 5 The Historical Approach
More than most state constitutional provisions, Connecticut's equal protection guarantee is of comparatively recent vintage. The constitution of 1818 had no *Page 542 
express guarantee of equal protection. The protection first appeared in the state constitution as article first, § 20, of the constitution of 1965. That provision has been amended twice. In 1974, it was amended to prohibit gender discrimination. Conn. Const., amend. V. It was again amended in 1984 to prohibit discrimination on the ground of physical or mental disability. Conn. Const., amend. XXI. Neither party has located anything in the contemporaneous debates that bears on the problem at hand. It is significant, however, that Bruno was decided (also in 1984) approximately eight months before Connecticut's twenty first amendment was ratified by the voters. Bruno has nothing to do with physical or mental disability, but it is nevertheless appropriate to view Connecticut's equal protection guarantee as enshrining, at a minimum, the equal protection norms of the time of its latest ratification.
 6 Economic-Sociological Considerations
Although no formal economic considerations bear on the issue presented here, the charter provision in question can usefully be explained in economic terms. Sellers of commodities often find it in their economic self interest to reduce the supply of goods that they are selling. The classic example of this is the Organization of Petroleum Exporting Countries and the world oil supply. Given the law of supply and demand, if demand remains constant and supply is limited, the advantage will belong to the seller.
Something like this has happened here. It is in the self interest of the class of political candidates to limit its competition. As the California Supreme Court explained in Zeilenga, a durational residency requirement "is a built-in device to prevent competition against . . . oldtimers. . . ." Zeilenga v. Nelson, supra, 4 Cal. 3d 722. The durational residency requirement at issue here was a product of the 1890s, when New Haven was *Page 543 
in the process of being transformed from a small town into a large city. Report of the Commission on the Revision of the Charter of the City of New Haven, (1894) p. xxi. Much of this transformation was the result of immigration. Seen in this light, the requirement can be seen as an attempt by the class of oldtimers to acquire a built-in advantage in the political marketplace with respect to the class of newcomers. While this economic model provides an explanation for what has happened, it hardly provides a justification for that phenomenon in a democratic society.
Sociological factors must now be considered. Connecticut is a geographically compact state. In modern times, it contains, in addition to some rural areas, a few densely populated cities surrounded by suburbs. Numerous people reside in suburbs and commute to work in nearby cities every day. Some commuters are as familiar with the cities in which they work as with the suburbs in which they sleep.
Some urban residents also commute to work, either to suburbs or to other cities. Many Connecticut residents, residents of New Haven among them, commute to New York every day. Just as residence in a suburb does not necessarily connote lack of familiarity with a nearby city, residence in a city does not necessarily connote anything more than a passing familiarity with that city. A bright line durational residence rule makes little sense in this sociological context. The variety of individual knowledge, commitment and experience being great, it is appropriate to leave the decision as to which mayoral candidate has the necessary qualifications to the voters.
Significantly, the vast majority of the 169 towns in Connecticut have made exactly this decision. The only qualification of elected municipal officers imposed by the General Statutes is that they be present electors of *Page 544 
the municipalities in which they are elected. General Statutes § 9-186. A survey of the mayoral qualifications imposed by the charters and ordinances of Connecticut's various towns appears in the appendix to this memorandum of decision. Only five durational residency requirements imposed by towns have been discovered. (The ordinances of a few towns could not be located.) New Haven and Waterbury impose durational residency requirements of five years each. New London has a durational residency requirement of one year. Naugatuck and Watertown impose durational residency requirements of six months each. The remaining towns including the cities of Bridgeport, Hartford and Stamford — simply follow § 9-186 in requiring their mayors to be present electors of the towns. (Citations appear in the appendix.) This practice by an overwhelming majority of towns provides an objective criterion of pertinent Connecticut norms. Cf. Duncan v. Louisiana, 391 U.S. 145, 161,88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968) (finding "existing laws and practices in the Nation" to be objective criterion by which to measure demands of due process). There is no evidence that New Haven and Waterbury — the only cities imposing five year requirements — have unique local conditions justifying their unique charter provisions.
 C Results of the Geisler Analysis
Under the unusual circumstances of this case, the Geisler factors establish that the durational residency provision at issue here fails to comport with the requirements of Connecticut's equal protection guarantee. The preceding discussion can be summarized as follows. (1) Connecticut's equal protection guarantee safeguards "political rights." An intratextual analysis of the Connecticut constitution establishes that those political *Page 545 
rights encompass notions of "free government" and the equality of persons engaged in political activity. (2) The Connecticut Supreme Court has squarely held in Bruno that there is a fundamental right to intrastate travel and that durational residency requirements, at least when applied to public employees, implicate this right. Although the right to campaign for political office is distinct from the right to hold public employment, Bruno's analysis renders this a distinction without a difference. "Since the right to travel is affected, the specific interest triggered by such requirements need not itself be a fundamental right for strict scrutiny to be triggered." (Internal quotation marks omitted.)Bruno v. Civil Service Commission, supra, 192 Conn. 345 n. 3. (3) U.S.Term Limits, Inc. v. Thornton, supra, 514 U.S. 819, revives both the Hamiltonian notion that "`the people should choose whom they please to govern them,'" and the related idea — enshrined as well in the Connecticut constitution — that the right to choose political leaders belongs not to the government but to the people. Id., 820-21. These powerful ideas — recently echoed in Bush — undermine the persuasive authority of the Supreme Court's now somewhat dated per curiam affirmances in Sununu and Chimento. (4) Sister state decisions have not been consistent, but many of these decisions treat the length of the required residence as an important factor. (5) Connecticut's equal protection guarantee, most recently ratified by the voters in 1984, the year of Bruno, enshrines at a minimum the equal protection norms of the time of its latest ratification. (6) Economic and sociological considerations establish that the durational residency requirement in question is ill suited to modern civic and political conditions in Connecticut and is not reflective of pertinent Connecticut norms. Under these circumstances, the appropriate equal protection analysis is similar to that of Bruno. The classification in question impinges upon the fundamental right to travel within the state. It additionally *Page 546 
impinges upon a second fundamental right — the right of the people, under the Connecticut constitution, to choose their political leaders. It also impinges upon a third right, which if not yet deemed fundamental is nevertheless a right of vital importance in a democracy — the right to seek elective office. Where the classification "impinges upon a fundamental right . . . it must be struck down unless justified by a compelling state interest." (Internal quotation marks omitted.) Bruno v.Civil Service Commission, supra, 192 Conn. 345. In this setting, the classification "must be drawn with `precision,' `tailored' to serve legitimate objectives; should a second route exist which is less offensive to constitutionally protected rights, then that route must be chosen." Id., 350.
The classification here is neither "drawn with `precision'" nor "`tailored' to serve legitimate objectives." It is, instead, a meat axe approach that excludes some qualified mayoral candidates and includes others of dubious qualification. Alternative classifications exist. One widely used, less burdensome classification — a one year durational residency requirement — has been approved by many courts, although it must be understood that the constitutionality of a one year requirement is not in issue here. Another solution of unquestionable constitutionality exists: Let the voters decide. To echo a refrain underpinning American democracy for more than two centuries, the right to choose political leaders — to decide who is qualified and who is not — rests not in the government, but in the people.
 VII CONCLUSION The motion for summary judgment is granted. A declaratory judgment shall enter declaring that the provision of article V, § 10 (a), of the charter that the mayor