# DEPARTMENT OF JUSTICE VIEWS ON THE PROPOSED CONSTITUTION DRAFTED BY THE FIFTH CONSTITUTIONAL CONVENTION OF THE UNITED STATES VIRGIN ISLANDS

*The following memorandum was initially drafted in the Office of Legal Counsel at the request of the Assistant Attorney General for Legislative Affairs. It analyzes several features of the proposed constitution of the U.S. Virgin Islands ("USVI"), including: (1) the absence of an express recognition of United States sovereignty and the supremacy of federal law; (2) provisions for a special election on the USVI's territorial status; (3) provisions conferring legal advantages on certain groups defined by place and timing of birth, timing of residency, or ancestry; (4) residence requirements for certain offices; (5) provisions guaranteeing legislative representation of certain geographic areas; (6) provisions addressing territorial waters and marine resources; (7) imprecise language in certain provisions of the proposed constitution's bill of rights; (8) the possible need to repeal certain federal laws if the proposed USVI constitution is adopted; and (9) the effect of congressional action or inaction on the proposed constitution.*

February 23, 2010

## MEMORANDUM OPINION FOR THE OFFICE OF MANAGEMENT AND BUDGET

This responds to the Office of Management and Budget's request for the views of the Department of Justice on the proposed constitution recently adopted by a constitutional convention in the U.S. Virgin Islands ("USVI") and submitted to the President by the Governor of the USVI.[1] Below we provide our analysis of several features of the proposed constitution that we believe warrant comment: (1) the absence of an express recognition of United States sovereignty and the supremacy of federal law; (2) provisions for a special election on the USVI's territorial status; (3) provisions conferring legal advantages on certain groups defined by place and timing of birth, timing of residency, or ancestry; (4) residence requirements for certain offices; (5) provisions guaranteeing legislative representation of certain geographic areas; (6) provisions addressing territorial waters and marine resources; (7) imprecise language in certain provisions of the proposed constitution's bill of rights; (8) the possible need to repeal certain federal laws if the proposed USVI constitution is adopted; and (9) the effect of congressional action or inaction on the proposed constitution.

Because we find it difficult to discern a legitimate governmental purpose that would be rationally advanced by the provisions conferring legal advantages on certain groups defined by place and timing of birth, timing of residency, or ancestry, we recommend that those provisions be removed from the proposed constitution. *See infra* part II.C. We conclude that the ten- and fifteen-year residence requirements for USVI Governors, Lieutenant Governors, and judges raise constitutional concerns, and we recommend that consideration be given to shortening the duration of these requirements. *See infra* part II.D. As explained below, the provision concerning territorial waters and marine resources appears to be inconsistent with governing federal law. We recommend that it be revised to remove any inconsistency and to make clear its recognition of Congress's plenary control over these matters. *See infra* part II.F.

---

[1] *See* Letter from Governor John P. de Jongh, Jr., to Hon. Barack H. Obama, President of the United States (Dec. 31, 2009).

## I. Background

The USVI is an unincorporated territory acquired by the United States from Denmark in 1917. *See* 48 U.S.C. § 1541(a) (2006); *Convention Between the United States and Denmark for Cession of the Danish West Indies*, 39 Stat. 1706 (1916); *see generally* Isaac Dookhan, *A History of the Virgin Islands of the United States* 258-62 (1994). The USVI's government is established under the Organic Act of 1936, as amended, 48 U.S.C. §§ 1405-1406m (2006), and the Revised Organic Act of 1954, as amended, 48 U.S.C. §§ 1541-1645 (2006). *See also* 48 U.S.C. §§ 1392-1397 (2006). A 1976 Act of Congress, however, permits the USVI to propose a constitution for the local government of the Islands. *See* Act of Oct. 21, 1976, Pub. L. No. 94-584, 90 Stat. 2899, as amended by Pub. L. No. 96-597, tit. V, § 501, 94 Stat. 3477, 3479 (1980), codified as a note following table of contents of 48 U.S.C. ch. 12 (2006) ("Enabling Act").

Under the 1976 Enabling Act, the USVI's legislature may "call [a] constitutional convention[] to draft, within the existing territorial-Federal relationship, [a] constitution[] for the local self-government of the people of the Virgin Islands." *Id.* § 2(a). The proposed constitution must: (1) "recognize, and be consistent with, the sovereignty of the United States over the Virgin Islands . . . and the supremacy of the provisions of the Constitution, treaties, and laws of the United States applicable to the Virgin Islands," including provisions of the Organic Act and Revised Organic Act that "do not relate to local self-government"; (2) "provide for a republican form of government, consisting of three branches: executive, legislative, and judicial"; (3) "contain a bill of rights"; (4) "deal with the subject matter of" provisions of the Organic Act and Revised Organic Act that "relate to local self-government"; and (5) provide for a system of local courts consistent with the Revised Organic Act. *Id.* § 2(b).

The Enabling Act requires the Governor of the Virgin Islands to submit a proposed constitution to the President. *See id*. § 4 ("Such constitutions shall be submitted to the President of the United States by the Governor[] of the Virgin Islands"). The President "shall transmit such constitution together with his comments to the Congress" within sixty days of receipt. *Id.* § 5. Congress may approve, amend, or modify the constitution by joint resolution, but the constitution "shall be deemed to have been approved" if Congress takes no action within "sixty legislative days (not interrupted by an adjournment sine die of the Congress) after its submission by the President." *Id.* Any constitution approved by Congress takes effect only if then approved by referendum in the USVI. *See id.*

A constitutional convention in the USVI proposed a constitution under the Enabling Act in 1978. The President transmitted this constitution to Congress with comments recommending certain changes. *See Message from the President of the United States Transmitting the Proposed Constitution for the Virgin Islands, Pursuant to Section 5 of Public Law 94-584*, H.R. Doc. No. 95-385 (1978). The constitution was then deemed approved under the Enabling Act because Congress took no action, but the USVI voters rejected it in a referendum. *See Department of Justice Views on the Constitution Adopted by the Constitutional Convention of the Virgin Islands*, 4B Op. O.L.C. 759, 760 n.1 (1980) ("*DOJ Views*"); S. Rep. No. 97-66, at 2 (1981). Another constitution was proposed in 1980. The President transmitted this constitution, too, providing comments and recommending changes based in part on a memorandum from the Department of Justice. *See Message from the President of the United States Transmitting a*

*Proposed Constitution for the Virgin Islands, Pursuant to Section 5 of Public Law 94-584*, H.R. Doc. No. 96-375 (1980) ("1980 Presidential Message" or "1980 Constitution"); *DOJ Views*, 4B Op. O.L.C. at 759. The USVI constitutional convention reconvened and proposed amendments to the constitution in response to Administration concerns, and Congress approved a modified version of the constitution by joint resolution. *See* Pub. L. No. 97-21, 95 Stat. 105 (1981); S. Rep. No. 97-66, at 2; H.R. Rep. No. 97-25, at 2 (1981); *Fourth Constitution of the Virgin Islands: Hearing Before the Senate Committee on Energy and Natural Resources*, 97th Cong., 173, 181 (1981) ("Hr'g on Fourth USVI Constitution"); Statement on Signing a Bill To Approve a Constitution for the United States Virgin Islands, 1981 Pub. Papers 617 (July 10, 1981). The USVI electorate, however, again rejected the constitution. *See DOJ Views*, 4B Op. O.L.C. at 759.

A constitutional convention in the USVI adopted the present proposed constitution at the end of May 2009, and the Governor of the USVI submitted it to the President on December 31, 2009. *See* Letter from Governor John P. de Jongh, Jr., to Hon. Barack H. Obama, President of the United States (Dec. 31, 2009). The Governor also forwarded a legal opinion on the draft constitution prepared by the Attorney General of the USVI. *See* Letter to the Hon. John P. de Jongh, Jr., Governor of the Virgin Islands, from Vincent F. Frazer, Esq., Attorney General (June 8, 2009) ("USVI AG Op."). Both the Governor and the Attorney General expressed concerns that the proposed constitution is inconsistent with the Enabling Act and the U.S. Constitution.

## II. Discussion

### A. Recognition of U.S. Sovereignty and the Supremacy of Federal Law

The Enabling Act requires any proposed constitution for the USVI to "recognize" and "be consistent with" United States sovereignty and the supremacy of the applicable provisions of the Constitution, treaties, and laws of the United States. Enabling Act § 2(b)(1). The current proposed constitution, like the one initially proposed in 1980, does not include an express statement directly satisfying this requirement. Indeed, one provision of the current constitution states, without any reference to the U.S. Constitution or federal law, that "[t]his Constitution shall be the supreme law of the Virgin Islands," *see* Constitution of the Virgin Islands of the United States, Fifth Constitutional Convention, art. II, § 5 (June 1, 2009) ("Proposed Const."), and in several places the proposed constitution refers to the USVI's "sovereignty" or "right of self-determination." *E.g.*, *id.* pmbl. para. 6, art. XII, § 2. Particularly in light of these provisions, we think it would be preferable if Congress revised—or urged a reconvened constitutional convention to revise—the proposed constitution to include a more express recognition of U.S. sovereignty and especially of the supremacy of federal law, as Congress did in considering the 1980 proposed constitution. Even in its current form, though, we conclude, as the Department did in reviewing the 1980 proposed constitution, that a number of provisions in the present proposed constitution considered together bring it into substantial compliance with the Enabling Act's requirement that the proposed constitution recognize U.S. sovereignty and the supremacy of federal law. *See DOJ Views*, 4B Op. O.L.C. at 760-61.

Because the Department's analysis of the 1980 proposed constitution informs our analysis of the current proposed constitution, we begin by describing the Department's 1980 analysis and the development of that earlier proposed constitution in some detail. The 1980

proposed constitution, like the constitution proposed now, included no express statement of federal sovereignty and supremacy. And that earlier proposed constitution described "[t]his Constitution and laws of the Virgin Islands enacted under it" as "the supreme law of the Virgin Islands." *See* 1980 Constitution at 7. The Justice Department nonetheless concluded that the 1980 proposed constitution was in "substantial compliance" with subsection 2(b)(1) of the Enabling Act because other provisions effectively acknowledged United States sovereignty and the supremacy of federal law. *See DOJ Views*, 4B Op. O.L.C. at 760-61. As the Department explained, the 1980 proposed constitution's preamble included a statement "declar[ing] that the Virgin Islands assume 'the responsibilities of self-government in political union with the United States.'" *See id.* at 760 (quoting 1980 proposed constitution). In prior testimony regarding a proposed constitution for the territory of Guam, a Justice Department witness had observed that "[n]early 200 years of political history have established that political union with the United States necessarily carries with it the recognition of the sovereignty of the United States and the supremacy of its laws," and that a statement in the preamble of the Guam constitution referring to "political union" with the United States was therefore "sufficient to overcome any contention that the explicit or tacit approval of the constitution by Congress would have the effect of relinquishing the sovereignty of the United States over Guam and the supremacy of Federal laws." *Constitution of Guam: Hearing Before the Senate Committee on Energy and Natural Resources*, 95th Cong. 64 (1978) (statement of Herman Marcuse, Attorney-Adviser, Office of Legal Counsel, Dep't of Justice). By the same token, the Department concluded that the reference to "political union" in the 1980 USVI proposed constitution sufficiently recognized federal sovereignty and supremacy to satisfy the Enabling Act. *See DOJ Views*, 4B Op. O.L.C. at 761. The Department further observed that a draft official analysis of the 1980 proposed constitution interpreted its preamble as recognizing U.S. sovereignty and that the proposed 1980 USVI constitution elsewhere limited the legislative power of the USVI government to "subjects . . . consistent with . . . the Constitution and laws of the United States applicable to the Virgin Islands." *See id.* at 760; *see also* Hr'g on Fourth USVI Constitution at 58 (reproducing draft official analysis); 1980 Constitution at 7.

In accordance with the Justice Department's conclusions, the President stated in his message transmitting the 1980 proposed constitution to Congress that "[t]he document implicitly recognizes the sovereignty of the United States and the supremacy of United States law over locally-enacted legislation, and is, therefore, in substantial compliance with the pertinent provision of the Enabling Act that established the procedure for the drafting of a constitution for the Virgin Islands." 1980 Presidential Message at iii.

Discussions in Congress led to a suggestion that an additional reference to U.S. sovereignty and federal supremacy be added. *See* Hr'g on Fourth USVI Constitution at 173, 194. The USVI constitutional convention then proposed and Congress adopted an additional clause qualifying the draft constitution's statement that the USVI constitution and laws enacted under it constituted the "supreme law of the Virgin Islands" so as to assert such supremacy only "[t]o the extent not inconsistent with the Constitution and laws of the United States." *See* S. Rep. No. 97-66, at 4; H.R. Rep. No. 97-25, at 2, 11; Pub. L. No. 97-21, 95 Stat. at 109.

The current proposed USVI constitution appears no less compliant with subsection 2(b)(1) of the Enabling Act than the constitution originally proposed in 1980, if not also the revised version of that constitution ultimately approved by Congress. Much as the preamble of

the 1980 constitution described the USVI as "assuming the responsibilities of self-government in political union with the United States," 1980 Constitution at 1, the preamble of the current proposed constitution declares that the USVI is "assuming the responsibilities of self-government *as an unincorporated territory of the United States*." Proposed Const. pmbl. para. 1 (emphasis added). The term "unincorporated territory of the United States," like the term "political union," carries a well-established meaning signifying recognition of the supremacy of the United States government. *Territorial Court of the Virgin Islands v. Richards*, 673 F. Supp. 152, 157 (D.V.I. 1987) (identifying the USVI as an "unincorporated territory" and describing Congress's authority over the territory as "plenary"), *aff'd*, 847 F.2d 108, 112 (3d Cir. 1988); *Harris v. Boreham*, 233 F.2d 110, 113-14 (3d Cir. 1956) (describing Congress's "sovereignty" over "unincorporated territories, such as the Virgin Islands"); S. Rep. No. 97-66, at 4 (report on the 1980 constitution describing the USVI as "an unincorporated territory of the United States subject to the plenary authority of the Congress"). Indeed, the Constitution itself prescribes that "[t]he Congress shall have Power to dispose of and make all needful Rules and Regulations" with respect to United States territories. U.S. Const. art. IV, § 3, cl. 2. The current proposed constitution's acknowledgment of the USVI's status as an "unincorporated territory of the United States" thus implies recognition of the United States' sovereignty over the USVI.

Furthermore, the current proposed constitution also recognizes congressional authority over the USVI by describing the 1917 treaty between the United States and Denmark as "confirm[ing]" that Congress may "determine[]" the "civil rights and political status of the inhabitants" of the USVI, *see* Proposed Const. pmbl. para. 3; it limits the legislative power of the USVI to "subjects of legislation consistent with . . . the Constitution and laws of the United States," just as the 1980 proposed constitution did, *see id.* art. V, § 1; 1980 Constitution at 7; and in certain other provisions it acknowledges the applicability of federal law, *see*, *e.g.*, Proposed Const. art. IV, § 4 (prohibiting any "political or religious test" for public office "other than an oath or affirmation to support the Constitution and laws of the Virgin Islands, and the Constitution and laws of the United States"); *id.* art. VII, § 2 (providing that decisions of the USVI Supreme Court "on questions arising under this Constitution and the laws of the Virgin Islands shall be final, except as Federal law may provide for review of such decisions by courts of the United States"); *id.* art. VII, § 3 (requiring rules in USVI courts to be consistent with the United States Constitution and federal laws). It is true that the current proposed constitution also states that it "shall be the supreme law of the Virgin Islands." *See id.* art. II, § 5. But while, as noted above, Congress revised the similar supremacy provision in the 1980 proposed constitution to declare that "[t]his Constitution and laws of the Virgin Islands enacted under it shall be the supreme law of the Virgin Islands" only "[t]o the extent not inconsistent with the Constitution and laws of the United States," Pub. L. No. 97-21, 95 Stat. at 109; *see also* Hr'g on Fourth USVI Constitution at 173, 194; S. Rep. No. 97-66, at 4; H.R. Rep. No. 97-25, at 2, 11, the President and the Department of Justice deemed the 1980 proposed constitution in "substantial compliance" with the Enabling Act even without this change. Moreover, the original supremacy provision in the 1980 proposed constitution was arguably less consistent with United States sovereignty and federal supremacy than the current provision. The supremacy clause of the 1980 proposed constitution appeared in a provision addressing legislative powers and asserted the supremacy not only of the proposed constitution, but also of "laws of the Virgin Islands enacted under it." *See* 1980 Constitution at 7. In contrast, the supremacy provision of the current proposed constitution appears in a stand-alone section and refers only to the USVI constitution. *See* Proposed Const. art. II, § 5. It may therefore be reasonably understood to indicate only that

5

the USVI constitution is "the supreme law of the Virgin Islands" in the sense of superseding other USVI laws but not federal law. *Cf.* Maine Const. art. X, § 6 (referring to the Maine constitution as "the supreme law of the State"); Iowa Const. art. XII, § 1 ("This constitution shall be the supreme law of the state, and any law inconsistent therewith, shall be void.").

Accordingly, while we think it would be preferable if Congress revised—or urged a reconvened constitutional convention to revise—the proposed constitution to include a more express recognition of U.S. sovereignty and especially of the supremacy of federal law, as Congress did in considering the 1980 proposed constitution, we believe the proposed constitution is in substantial compliance with subsection 2(b)(1) of the Enabling Act. *DOJ Views*, 4B Op. O.L.C. at 761.

### B.  Political Status Elections

In Article XVII, the proposed constitution provides for a "special election," to be held after a year of "Public Education" programs conducted by a "Political Status Advisory Commission," on "the status and federal relations options of:  (1) statehood, (2) free association, and (3) Independence."  Proposed Const. art. XVII, §§ 1, 2(a).  Because Congress in the Enabling Act has authorized conventions to draft a USVI constitution only for "local self-government" "within the existing territorial-Federal relationship," Enabling Act § 2(a); *see also* S. Rep. No. 94-1033, at 4 (1976) (emphasizing that "the constitution [authorized by the Enabling Act] is not a status document and that the issue of local self-government should not be delayed or confused with discussions relating to alterations in existing federal relations"); *id.* at 8 (letter from the Assistant Secretary of the Interior to the same effect), some may question the appropriateness of the inclusion of this provision in the proposed constitution.  We do not believe, however, that this provision violates the Enabling Act.

Given Congress's constitutional authority over territories, any change in status for the USVI would require action by Congress.  *See* U.S. Const. art. IV, § 3, cl. 2; *see also*, *e.g.*, *Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 586 n.16 (1976); *Simms v. Simms*, 175 U.S. 162, 167-68 (1899); *Talbott v. Silver Bow County*, 139 U.S. 438, 445-46 (1891); *First Nat'l Bank v. Yankton County*, 101 U.S. 129, 132-33 (1879); *Bluebeard's Castle, Inc. v. Gov't of the Virgin Islands*, 321 F.3d 394, 397 (3d Cir. 2003).  The special election therefore would not effect any departure from the "existing territorial-Federal relationship."  Moreover, the USVI local government has established public education commissions on the USVI's territorial status in the past and in 1993 held a referendum on the subject.  We believe such efforts to canvass the electorate on issues of fundamental concern may serve valid purposes of local self-government.  *See*, *e.g.*, 1988 V.I. Sess. Laws 5332; *see generally* H.R. Rep. No. 111-357, at 4 (2009); Stanley K. Laughlin, Jr., *The Law of the United States Territories and Affiliated Jurisdictions* 380 (1995).

### C.  Classifications Based on Place and Timing of Birth, Timing of Residence, and Ancestry

Several provisions of the proposed constitution give special advantages to "Native Virgin Islanders" and "Ancestral Native Virgin Islanders."  These provisions raise serious concerns

under the equal protection guarantee of the U.S. Constitution, which has been made applicable to the USVI by the Revised Organic Act.

In Article III, section 2, the proposed constitution would define "Native Virgin Islander" to mean (1) "a person born in the Virgin Islands after June 28, 1932," the enactment date of a statute generally extending United States citizenship to USVI natives residing in United States territory as of that date who were not citizens or subjects of any foreign country, *see* Act of June 28, 1932, ch. 283, 47 Stat. 336 (now codified at 8 U.S.C. § 1406(a)(4) (2006)); and (2) a "descendant[] of a person born in the Virgin Islands after June 28, 1932." "Ancestral Native Virgin Islander" would be defined as: (1) "a person born or domiciled in the Virgin Islands prior to and including June 28, 1932 and not a citizen of a foreign country pursuant to 8 U.S.C. [§] 1406," the statute governing United States citizenship of USVI residents and natives; (2) "descendants" of such individuals; and (3) "descendants of an Ancestral Native Virgin Islander residing outside of the U.S., its territories and possessions between January 17, 1917 and June 28, 1932, not subject to the jurisdiction of the U.S. and who are not a citizens [*sic*] or a subjects [*sic*] of any foreign country." Proposed Const. art. III, § 1.[2]

### 1. Property Tax Exemption for Ancestral Native Virgin Islanders

Under the proposed constitution, the USVI legislature would be authorized to impose real property taxes, but "[n]o Real Property tax shall be assessed on the primary residence or undeveloped land of an Ancestral Native Virgin Islander." Proposed Const. art. XI, § 5(g). The property tax exemption for Ancestral Native Virgin Islanders raises serious equal protection concerns. The Equal Protection Clause of the Fourteenth Amendment, which has been extended to the USVI by statute, *see* 48 U.S.C. § 1561 (2006),[3] generally requires only that legislative classifications be rationally related to a legitimate governmental purpose. *See*, *e.g.*, *Heller v. Doe*, 509 U.S. 312, 319-20 (1993). But the proposed constitution does not identify a legitimate governmental purpose that the real property tax exemption for Ancestral Native Virgin Islanders would further, and it is difficult for us to discern a legitimate governmental purpose that the exemption could be said to further.

The definition of Ancestral Native Virgin Islander appears to combine two sub-classes: (i) individuals born or domiciled in the USVI before a certain date and (ii) descendants of such

---

[2] The third prong of this definition appears circular insofar as it defines "Ancestral Native Virgin Islander" in terms of descendants of "Ancestral Native Virgin Islanders" (a category of people already encompassed by the definition's second prong), and it is also grammatically ambiguous with respect to whether the qualifying terms modify the "descendants" or the "Ancestral Native Virgin Islander" from whom they are descended.

We think it clear that these classifications could not be considered tribal within the meaning of the Indian Commerce Clause, U.S. Const. art. I, § 8, cl. 3, that is, as falling within the established body of law defining the special relationship between aboriginal peoples of the United States and the Federal Government. In any event, that Clause empowers Congress, not the government of the Virgin Islands.

[3] *See also*, *e.g.*, *Government of the Virgin Islands v. Davis*, 561 F.3d 159, 163-64 n.3 (3d Cir. 2009) (recognizing applicability of the Fifth and Fourteenth Amendment Due Process Clauses to the USVI under the Revised Organic Act); *Hendrickson v. Reg O Co.*, 657 F.2d 9, 13 n.2 (3d Cir. 1981) (same); *Moolenaar v. Todman*, 433 F.2d 359, 359 (3d Cir. 1970) (per curiam) (requiring adherence to "the constitutional requirements of equal protection of the law" in the USVI).

persons. The first sub-class may include many long-time residents of the USVI, but to the extent the real property tax exemption is designed to benefit such long-time residents it raises serious equal protection concerns. The Supreme Court has held that statutes limiting benefits, including property tax exemptions, to citizens residing in a jurisdiction before a specified date are not rationally related to any legitimate governmental purpose. For example, in *Hooper v. Bernalillo County Assessor*, 472 U.S. 612 (1985), the Court held that a New Mexico property tax exemption applicable only to Vietnam War veterans who resided in the state before a certain date violated equal protection by "creat[ing] two tiers of resident Vietnam veterans, identifying resident veterans who settled in the State after May 8, 1976, as in a sense 'second-class citizens.'" *Id.* at 623. Explaining that "singling out previous residents for the tax exemption[] [and] reward[ing] only those citizens for their 'past contributions' toward our Nation's military effort in Vietnam" was "not a legitimate state purpose," the Court held that the tax exemption violated the Equal Protection Clause by "creat[ing] fixed, permanent distinctions . . . between . . . classes of concededly bona fide residents.'" *Id.* at 622-23 (quoting *Zobel v. Williams*, 457 U.S. 55, 59 (1982)); *see also*, *e.g.*, *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 909, 911 (1986) (plurality opinion) (applying heightened scrutiny to invalidate civil service employment preference limited to veterans who lived in the state when they entered the armed forces); *id.* at 913 (Burger, C.J., concurring in judgment) (same under rational basis review); *Bunyan v. Camacho*, 770 F.2d 773, 776 (9th Cir. 1985) (invalidating law enacted by Guam legislature awarding certain retirement credits for higher education degrees to Guam civil servants only if they resided in Guam before pursuing the degree).

Moreover, even as to this sub-class, the real property tax exemption proposed here appears to be even less constitutionally justifiable than benefits for long-time residents. In *Nordlinger v. Hahn*, 505 U.S. 1 (1992), the Supreme Court upheld a California real property valuation system that disfavored newer purchasers (though not necessarily newer or longer-term residents), and the Court recognized as legitimate two governmental interests for such a system: "local neighborhood preservation, continuity, and stability," *id.* at 12, and honoring the reliance interests of long-time property owners, *id.* at 12-13. To the extent that those interests might be offered in defense of tax benefits for long-time residents or property owners, they cannot justify the real property tax exemption for Ancestral Native Virgin Islanders. Neither of those interests appears to be rationally furthered by the first sub-class included in the proposed property tax exemption for Ancestral Native Virgin Islanders because membership in that sub-class is defined neither by length of residence nor even by length of property ownership in the USVI, but simply by having been born or having lived in the USVI many years ago. Thus, for example, an individual born in the USVI on June 28, 1932, who left the Islands the following year and who moved back to the Islands and bought a home there 50 years later (or who simply bought an undeveloped piece of land there 50 years later) would be entitled to immunity from real property taxes even though an individual who had spent his or her whole life in the USVI and had owned the same home there for the past 50 years, but who had been born there of parents who had arrived in the USVI as immigrants on June 29, 1932, would not be so shielded. How a system permitting this kind of discrimination could be said to further neighborhood stability or reliance interests of long-time property owners is unclear.

The second sub-class benefitted by the real property exemption for Ancestral Native Virgin Islanders also seems difficult to justify as furthering a legitimate governmental interest, for the second sub-class is defined simply by parentage or ancestry. We need not delve into

whether this use of "ancestry" in classifying citizens would be deemed "suspect" and thus subject to heightened scrutiny under the Fourteenth Amendment. *See*, *e.g.*, *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 & n.4 (1976) (per curiam) (identifying alienage, race, and ancestry as classifications subject to strict scrutiny). Again, it is unclear to us what legitimate governmental purpose would support favoring so starkly the descendants of individuals born or resident long ago in the USVI regardless of the descendants' own connections (or lack thereof) to the Islands.

Because we find it difficult to discern a legitimate governmental purpose that would be rationally advanced by providing property tax exemptions only for Ancestral Native Virgin Islanders, we would recommend revising the proposed constitution to eliminate Article XI, section 5(g).

### 2. *Provisions on Voting and Office-Holding Favoring Native Virgin Islanders and Ancestral Native Virgin Islanders*

Provisions in the proposed constitution that limit certain offices and the right to vote in certain elections to Native Virgin Islanders and Ancestral Native Virgin Islanders or that guarantee members of those groups the right to participate in certain elections present similar issues. Under the proposed constitution, the positions of Governor and Lieutenant Governor would be open only to members these groups, *see* Proposed Const. art. VI, § 3(d), as would service on the Political Status Advisory Commission, an eleven-member body composed of four appointed members and seven elected members that would promote awareness of the USVI's political status options and advise the Governor and legislature on "methods to achieve a full measure of self-government." *Id.* art. XVII, §§ 1(b), 3. The special election on "status and federal relations options" provided for under the proposed constitution would be "reserved for vote by Ancestral Native and Native Virgin Islanders only, whether residing within or outside the territory." *Id.* art. XVII, § 2. And the proposed constitution would guarantee that "Ancestral and Native Virgin Islanders, including those who reside outside of the Virgin Islands or in the military, shall have the opportunity to vote on" amendments to the USVI constitution. *Id.* art. XVIII, § 7.[4]

The provisions concerning eligibility to vote in certain elections raise equal protection concerns. To the extent one might attempt to justify the limitation on the electorate for the special election on status options as akin to a durational residence requirement, we believe it is too restrictive to be so justified. Although the Supreme Court has upheld a very brief residential limitation on eligibility to vote in one instance based on a state's legitimate interest in "prepar[ing] adequate voter records and protect[ing] its electoral processes from possible frauds," *Marston v. Lewis*, 410 U.S. 679, 680 (1973) (per curiam) (upholding 50-day durational residence requirement), it has held that even a requirement of one year's residence for voting,

---

[4] The right to vote on such amendments does not appear to be limited to these groups, as the same provision requires that amendments be submitted "to the electors of the Virgin Islands." Proposed Const. art. XVIII, § 7. Although the term "electors of the Virgin Islands" is undefined, the proposed constitution elsewhere provides that "[e]very citizen of the United States and the Virgin Islands eighteen (18) years of age or older and registered to vote in the Virgin Islands shall have the right to vote." *Id.* art. IV, § 1. The separate provisions establishing special voting rights and opportunities for Ancestral Native Virgin Islanders and Native Virgin Islanders suggest that the term "electors of the Virgin Islands" refers to the broader group of eligible voters.

as opposed to office-holding, violates constitutional equal protection guarantees. *See Dunn v. Blumstein*, 405 U.S. 330, 360 (1972) (invalidating state's requirement that voters have resided in the state for one year and the county for three months). Moreover, the classifications here are not based on length of residence, and their effects appear potentially arbitrary. As discussed above, the categories of Ancestral Native Virgin Islanders and Native Virgin Islanders are based simply on place and timing of birth, the fact of having resided in the USVI before a certain date regardless of for how brief a time, or ancestry, regardless of the individual's own connection to the USVI. Thus, they could prohibit, for example, a foreign-born but life-long resident of the USVI from voting on political status, but would permit any qualifying ancestral descendant, including those who have never lived in the USVI, to do so. *Cf. Soto-Lopez*, 476 U.S. at 915 (Burger, C.J., concurring in judgment) (discussing "irrationality" of law that "would grant a civil service hiring preference to a serviceman entering the military while a resident of [the state] even if he was a resident only for a day," but that would deny the preference to a veteran "who was a resident of [the state] for over 10 years before applying for a civil service position"); *Dunn*, 405 U.S. at 360 (concluding that the state interest in "knowledgeable" voters did not justify a durational residence requirement for voting because "there is simply too attenuated a relationship between the state interest in an informed electorate and the fixed requirement that voters must have been residents in the State for a year and the county for three months"); *Kramer v. Union Free School Dist. No. 15*, 395 U.S. 621, 632 (1969) (rejecting, under strict scrutiny, restrictions on franchise for school board elections because "[t]he classifications in [the statute] permit inclusion of many persons who have, at best, a remote and indirect interest in school affairs and, on the other hand, exclude others who have a distinct and direct interest in the school meeting decisions").

The proposed constitution's guarantee that Native Virgin Islanders and Ancestral Native Virgin Islanders "resid[ing] outside of the Virgin Islands" may vote on amendments to the USVI constitution also raises equal protection concerns. Proposed Const. art. XVIII, § 7. To uphold inclusion of non-resident voters in local government elections against equal protection challenges, courts have required a showing that the non-resident voters have a "substantial interest" in the elections in question. *See*, *e.g.*, *May v. Town of Mountain Village*, 132 F.3d 576, 583 (10th Cir. 1997) (upholding inclusion of nonresident property owners in town electorate because such voters "have a substantial interest in township elections"); *Bd. of County Comm'rs of Shelby County, Tenn. v. Burson*, 121 F.3d 244, 248-51 (6th Cir. 1997) (deeming participation of city voters in county school board elections irrational and thus impermissible under Fourteenth Amendment where city voters had their own independent school board and lacked a substantial interest in county school board elections); *Hogencamp v. Lee County Bd. of Educ.*, 722 F.2d 720, 722 (11th Cir. 1984) (deeming city taxpayers' contribution of 2.74% of county school board's budget "insufficient by itself to create a substantial interest in the city residents" justifying their participation in county school board elections). Because many non-resident Ancestral Native Virgin Islanders and Native Virgin Islanders may have no connection to the Islands apart from ancestry, it is unclear whether their inclusion in the electorate for USVI constitutional amendments would satisfy this standard.

Finally, although the residential duration requirements discussed below for Governor and Lieutenant Governor and members of the Political Status Advisory Commission would prevent non-resident individuals who qualify as Native Virgin Islanders or Ancestral Native Virgin Islanders from serving in those offices, it is unclear what legitimate governmental purpose would

be advanced by narrowing the subset of longtime residents who could hold those offices to Native Virgin Islanders and Ancestral Native Virgin Islanders.

In the absence of any identified legitimate governmental interest to support such provisions concerning voting and office-holding based on place of birth, residence many decades ago, or ancestry, we would again recommend that these provisions be removed from the proposed constitution.[5]

### D. Residence Requirements for Office-Holding

In addition to the birth and ancestry qualifications discussed above, the proposed constitution imposes substantial residence requirements on a number of USVI offices. In particular, the Governor and Lieutenant Governor would be required to have been "domiciliar[ies]" of the USVI for at least fifteen years, ten of which "must immediately precede the date of filing for office," Proposed Const. art. VI, § 3(a); judges and justices of the USVI Supreme Court and lower court to be established under the proposed constitution would be required to have been "domiciled" in the USVI for at least ten years "immediately preceding" the judge or justice's appointment, *id.* art. VII, § 5(b); the Attorney General and Inspector General would need to have resided in the USVI for at least five years, *id.* art. VI, §§ 10(a)(1), 11(a)(2);[6] and the members of the Political Status Advisory Commission would be required to have been "domiciliaries" of the USVI for "a minimum of five years," *id.* art. XVII, § 1(b). In addition, the proposed constitution would require that USVI Senators be "domiciled" in their legislative district "for at least one year immediately preceding the first date of filing for office." *Id.* art. V, § 3(c).

These requirements, particularly those requiring more than five years of residence, raise potential equal protection concerns. As explained in the Department of Justice's comments on the proposed 1980 constitution, "[t]he Supreme Court has held that candidates for public office 'do have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications.'" *See DOJ Views*, 4B Op. O.L.C. at 766 (quoting *Turner v. Fouche*, 396 U.S. 346, 362 (1970)). Though noting that the Supreme Court has summarily affirmed three decisions upholding five- to seven-year residence requirements for state senators and governors, *see id.* at 767 (citing *Chimento v. Stark*, 353 F. Supp. 1211, 127 (D.N.H. 1973), *aff'd*, 414 U.S. 802 (1973); *Kanapaux v. Ellisor* (D.S.C. unreported), *aff'd*, 419 U.S. 891 (1974); *Sununu v. Stark*, 383 F. Supp. 1287 (D.N.H. 1974), *aff'd*, 420 U.S. 958 (1975)), the Department's memorandum observed that the Supreme Court "has not as yet passed on durational residence requirements for the holding of office," *see id.*, and that lower courts have struck down laws imposing residence requirements of five or more years on certain state or local

---

[5] Because we conclude that the restrictions on voting present clear equal protection concerns under the Fourteenth Amendment, we need not consider whether they may also violate the Fifteenth Amendment's prohibition on denial or abridgement of the right to vote "on account of race, color, or previous condition of servitude." U.S. Const. amend. XV; *see also* 48 U.S.C. § 1561 (extending Fifteenth Amendment to USVI).

[6] The proposed constitution appears ambiguous with respect to how this five-year period is determined. It provides: "There shall be an Attorney General, who shall be appointed by the Governor with the advice and consent of the Senate, and at the time of the appointment must . . . have resided in the Virgin Islands at least five (5) years next preceding his election." *See* Proposed Const. art. VI, § 10(a)(1). Given that the Attorney General would be appointed rather than elected, the reference to the period "next preceding his election" seems unclear.

offices. *See id.* at 767-68 (collecting cases). The 1980 Justice Department memorandum therefore concluded that while certain five-year residence requirements in the 1980 proposed constitution likely would not "give rise to serious constitutional problems," there was "every reason to question whether the courts [would] uphold" fifteen-year residence requirements for the offices of Governor and Lieutenant Governor under that proposed constitution. *See id.* at 768.

Likewise, the President observed in his message to Congress that the fifteen-year residence requirements in the 1980 constitution "may violate the Federal constitutional prohibition against discriminatory qualifications for public office." 1980 Presidential Message at iv. As for Congress, the legislative history indicates that its approval of the 1980 constitution did not signify any "opinion on the merits of these provisions," and that it too recognized that the fifteen-year "domiciliary qualifications" in that constitution might "be invalidated if they are found to be incompatible with the United States Constitution." *See* H.R. Rep. No. 97-25, at 3; *see also* S. Rep. No. 97-66, at 5.

The case law since 1980 on durational residence requirements for state and local offices generally supports the Department's analysis provided at that time. In *Clements v. Fashing*, 457 U.S. 957 (1982), a plurality of the Supreme Court observed that "the existence of barriers to a candidate's access to the ballot 'does not of itself compel close scrutiny,'" and that "[d]ecision in this area of constitutional adjudication is a matter of degree, and involves a consideration of the facts and circumstances behind the law, the interests the State seeks to protect by placing restrictions on candidacy, and the nature of the interests of those who may be burdened by the restrictions." *Id.* at 963 (plurality opinion) (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)). *Clements*, however, did not involve durational residence requirements, but rather provisions requiring a waiting period or mandatory resignation before certain current state officeholders could seek new elective offices. *See id.* at 966-71. In another case, a concurring opinion, citing *Chimento*'s approval of a seven-year residence requirement for a state governor, suggested that residence requirements may serve legitimate purposes, but this opinion did not elaborate on how long a period of prior residence may be required. *See Zobel*, 457 U.S. at 70 (Brennan, J., concurring) (observing that "allegiance and attachment may be rationally measured by length of residence . . . and allegiance and attachment may bear some rational relationship to a very limited number of legitimate state purposes").

One court of appeals has concluded, based on the Supreme Court summary affirmances cited in the Department's 1980 memorandum, that at least "some durational residency requirements are constitutional." *City of Akron v. Bell*, 660 F.2d 166, 168 (6th Cir. 1981). This court thus upheld a one-year residence requirement for city council members based on the local government's interest in "knowledgeable candidates." *See id.* at 168-69. In other recent decisions, courts have similarly upheld relatively brief residence requirements for state or local offices, typically applying only rational basis review and deeming such laws adequately justified by the governmental interest in ensuring familiarity with local concerns. *See, e.g., MacDonald v. City of Henderson*, 818 F. Supp. 303, 306 (D. Nev. 1993) (one-year residence requirement for city council); *Hankins v. Hawaii*, 639 F. Supp. 1552, 1556 (D. Hawaii 1986) (five-year residence requirement for Hawaii governor under state constitution); *Schiavone v. DeStefano*, 852 A.2d 862, 866-67 (Conn. Sup. Ct. 2001) (five-year residence requirement for city mayor); *Civil Service Merit Bd. of City of Knoxville v. Burson*, 816 S.W.2d 725, 734 (Tenn. 1991) (one-year

residence requirement for municipal civil service boards); *State ex rel. Brown v. Summit County Bd. of Elections*, 545 N.E.2d 1256, 1259-60 (Ohio 1989) (two-year residence requirement for city council); *Langmeyer v. Idaho*, 656 P.2d 114, 118 (Idaho 1982) (five-year residence requirement for appointment to local planning and zoning board); *see also*, *e.g.*, *Thournir v. Meyer*, 909 F.2d 408, 411 (10th Cir. 1990) (upholding under rational basis review state requirement that unaffiliated candidates have been registered as unaffiliated voters in the state for at least one year before filing for office); *White v. Manchin*, 318 S.E.2d 470, 488, 491 (W.Va. 1984) (applying strict scrutiny based on the fundamental right "to become a candidate for public office" but upholding state constitutional requirement that state senators have resided in their district for at least one year before their election). On the other hand, at least one federal court has recently applied strict scrutiny to invalidate a state requirement that state legislators have resided within their legislative districts for at least one year. *See Robertson v. Bartels*, 150 F. Supp. 2d 691, 696, 699 (D.N.J. 2001) (applying strict scrutiny based on "the combined right of persons to run for public office and the right of voters to vote for candidates of their choice"); *see also*, *e.g.*, *Peloza v. Freas*, 871 P.2d 687, 691 (Alaska 1994) (applying heightened scrutiny under state constitution and invalidating three-year residence requirement for city council).

Insofar as the territorial status and unique history and geography of the USVI make familiarity with local issues particularly important for office-holders there, the governmental interests supporting durational residence requirements for USVI offices may be particularly strong. *See DOJ Views*, 4B Op. O.L.C. at 768; *see also*, *e.g.*, *Hankins*, 639 F. Supp. at 1556 (observing that "[t]he State has a strong interest in the assurance that its governor will be a person who understands the conditions of life in Hawaii" and that "[t]his concern has 'particular relevance in a small and comparatively sparsely populated state'" (quoting *Chimento*, 353 F. Supp. at 1215)); *cf. Bell*, 660 F.2d at 168 (noting that "the interests of [a state or local] governmental unit in knowledgeable candidates and knowledgeable voters may be served by differing lengths of durational residency requirements"). Yet at least some courts might consider the lengthy residence requirements here—particularly the ten- or fifteen-year periods required for USVI judges, Governors, and Lieutenant Governors—unjustified. *Cf. Clements*, 457 U.S. at 963 (plurality opinion) (observing that "[d]ecision in this area of constitutional adjudication is a matter of degree"); *Summit County Bd. of Elections*, 545 N.E.2d at 1260 (upholding two-year residence requirement but deeming it "conceivable that such a requirement may be too long in duration to serve a legitimate state interest").

Accordingly, we would note that these provisions raise constitutional concerns, and we would recommend that consideration be given to shortening the ten- and fifteen-year residence requirements for USVI Governors, Lieutenant Governors, and judges. *Cf.* 1980 Presidential Message at iv, 10, 22 (recommending that 1980 proposed constitution be revised to require that the Governor and Lieutenant Governor have been domiciliaries of the USVI for ten years instead of fifteen years, even though provision required only five years of residence immediately preceding the date of taking office).

### E. Potentially Unequal Legislative Districts

The proposed constitution defines electoral districts for several USVI offices, including members of the USVI Senate. The Senate, which would serve as the USVI's unicameral legislature, would include between eleven and fifteen members. *See* Proposed Const. art. V,

§§ 1, 2(a). Beginning with the first election in 2012, the Senate would consist of: (1) six Senators elected "at large" by the Islands as a whole, three of whom must be residents of St. Croix and three of whom must be residents of St. Thomas or St. John; (2) two Senators elected from each of two sub-districts on St. Croix; (3) two elected from each of two sub-districts on St. Thomas; and (4) one elected from St. John. *Id.* art. V, § 2(a)(1). At least once every ten years and within 120 days of the publication of the official census for the Islands, the Senate would be required to appoint a "reapportionment commission," which would develop a plan, to be approved by the USVI Supreme Court, for the reapportionment of "At-Large and sub-district senate seats that are contiguous and compact areas." *Id.* art. V, § 2(b).[7] Although the proposed constitution provides that the areas in these districts "shall be constituted as to give, as nearly as is practicable, representation in proportion to the census population," the plan also would be required to "provide for at least one Senator from St. John." *See id.* art. V, § 2(b). These provisions, particularly the reservation of a Senate seat for St. John, raise equal protection concerns because they may prove to be at odds with the principle of "one person one vote."

The Supreme Court has held that the Equal Protection Clause of the Fourteenth Amendment requires states to "'make an honest and good faith effort to construct districts [for legislative representatives] as nearly of equal population as is practicable.'" *Larios v. Cox*, 300 F. Supp. 2d 1320, 1339 (N.D. Ga. 2004) (quoting *Reynolds v. Sims*, 377 U.S. 533, 556 (1964)), *aff'd*, *Cox v. Larios*, 542 U.S. 947 (2004). As noted above, this requirement is applicable to the USVI by statute. *See* 48 U.S.C. § 1561; *Moolenaar v. Todman*, 433 F.2d 359, 359 (3d Cir. 1970) (per curiam). Accordingly, insofar as the islands comprising the USVI have (or later develop) populations significantly disproportionate to the number of seats reserved for them in the Senate, the provisions for specified geographic representation may be subject to challenge for violating this "one person one vote" requirement of equal protection.

The Supreme Court has established a burden-shifting framework for evaluating "one person one vote" claims based on the deviation in population per representative between the most overrepresented and the most underrepresented electoral districts in a jurisdiction, factoring in at-large representatives. *See*, *e.g.*, *Bd. of Estimate of N.Y. City v. Morris*, 489 U.S. 688, 701-02 & n.9 (1989); *Brown v. Thomson*, 462 U.S. 835, 842-43 (1983). As a general rule, "an apportionment plan with a maximum population deviation under 10%" constitutes only a "'minor deviation from mathematical equality'" and is "'insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment.'" *Brown*, 462 U.S. at 842 (quoting *Gaffney v. Cummings*, 412 U.S. 735, 745 (1973)). Districting plans with such deviations may not be "automatically immune from constitutional attack," but they are at least "presumptively constitutional, and the burden lies on the plaintiffs to rebut that presumption." *Larios v. Cox*, 300 F. Supp. 2d at 1340-41; *see also Cox v. Larios*, 542 U.S. at 949 (Stevens, J., concurring) (describing Court's summary affirmance as "properly reject[ing]" the defendants' "invitation" to "creat[e] a safe harbor for population deviations of less than 10 percent"). "A plan with larger disparities in population . . . creates a prima facie case of discrimination and therefore must be justified by the State." *Brown*, 462 U.S. at 842-43; *see also Voinovich v. Quilter*, 507 U.S. 146, 160-62 (1993). Legitimate justifications for a disparity may include preserving the integrity of political subdivisions or recognizing natural or historical boundaries,

---

[7] Article V, § 2(b) refers to a plan for "reappointment" rather than "reapportionment." We assume this is a typographical error.

*see DOJ Views*, 4B Op. O.L.C. at 766 (citing *Reynolds v. Sims*, 377 U.S. 533, 580-81 (1964); *Swann v. Adams*, 385 U.S. 440, 444 (1967)), and the Supreme Court has upheld even a sizeable deviation from population equality in light of "the importance, consistency, and neutrality of the state policies alleged to require the population disparities." *Brown*, 462 U.S. at 848 (Stevens and O'Connor, JJ., concurring). On the other hand, the Court has cautioned that "[e]ven a neutral and consistently applied criterion such as use of counties as representative districts can frustrate *Reynolds*' mandate of fair and effective representation if the population disparities are excessively high." *Id.* at 845.

The 1980 proposed constitution similarly required a representative from St. John in the USVI Senate. *See* 1980 Constitution art. V, §§ 2, 3. With respect to this requirement, the Justice Department concluded: "[w]hether such a ["one person one vote"] violation would ultimately occur would likely turn on specific facts in existence at the time." *DOJ Views*, 4B Op. O.L.C. at 766. That statement remains true today. But according to the Attorney General of the USVI, data from the 2000 census indicate that the St. John's senate district would involve a deviation of 53% from the ideal of equal representation. *See* USVI AG Op. at 13.

The USVI's island geography and any historic political representation for St. John might help justify the inequalities between districts. *See*, *e.g.*, *Travis v. King*, 552 F. Supp. 554, 560 (D. Hawaii 1982) (concluding "[b]ased on the unique geographic and economic insularity of the four basic island units," that the objective of providing each main island of Hawaii "meaningful representation" in the state legislature was "a rational one"); *Burns v. Gill*, 316 F. Supp. 1285, 1292, 1293, 1299 (D. Hawaii 1970) (upholding disparities between electoral districts in Hawaii based on the "conclusion that if [Hawaii's] voters are to have functional representation in their State legislature each basic island unit must be given meaningful recognition therein"). Indeed, the Revised Organic Act, though permitting reapportionment "as provided by the laws of the Virgin Islands," initially provided for separate representation of St. John in the USVI Senate. *See* 48 U.S.C. § 1571(b); *see generally Moolenaar v. Todman*, 317 F. Supp. 226, 229-30 (D.V.I. 1970) (describing historical enactments regarding representation in USVI Senate), *rev'd*, 433 F.2d 359 (3d Cir. 1970) (per curiam). We understand, however, that at present the USVI legislature does not include a Senator elected solely by St. John voters; the USVI Senate, rather, includes seven Senators from the District of St. Croix and seven from the District of St. Thomas/St. John, plus one Senator elected at large who must be a resident of St. John. *See* Legislative History, Legislature of the Virgin Islands, *available at* http://www.legvi.org/ LEGVI2008/history.htm. Insofar as guaranteed representation for St. John is a departure from current or historic practice, or if disparities are simply too large to be justified by such historic practices, the USVI's senatorial districts under the proposed constitution might be subject to an equal protection challenge. For example, the court in *Travis v. King* rejected a districting plan for the Hawaii state senate with a 43.18% total deviation even though the state invoked the need for separate representation of the state's island units as a justification for the disparity. *See* 552 F. Supp. at 560, 562-63; *see also*, *e.g.*, *Bd. of Estimate of N.Y. City*, 489 U.S. at 702-03 (concluding that "accommodat[ion] [of] natural and political boundaries as well as local interests" was insufficient to justify a 78% disparity in representation of New York City's five boroughs on a municipal board).

Because any challenge to USVI's Senate districts would be fact-specific, we do not recommend specific changes to the proposed constitution to address these concerns. Indeed,

we note that although the Justice Department indicated potential "one person one vote" concerns with respect to the 1980 proposed constitution, *see DOJ Views*, 4B Op. O.L.C. at 766, the President did not communicate such concerns to Congress in his transmittal message. *See* 1980 Presidential Message at iii-v. As in the 1980 Justice Department memorandum, however, we would note the potential litigation risk posed by these provisions.

### F.  Territorial Waters, Marine Resources, and Submerged Lands

Article XII, Section 2, concerning "Preservation of Natural Resources," states:

> The Government shall have the power to manage, control and develop the natural and marine resources comprising of submerged lands, inlets, and cays; to reserve to itself all such rights to internal waters between the individual islands, claim sovereignty over its inter-island waters to the effect that the territorial waters shall extend 12 nautical miles from each island coast up to the international boundaries. This is an alienable right of the people of the Virgin Islands of the U.S. and shall be safeguarded.

The intended meaning and effect of this provision are not entirely clear. To the extent that its reference to a claim of "sovereignty" over coastal waters is intended to derogate from the sovereignty of the United States over those waters, it is inconsistent with federal law and should be removed. *See* Proclamation No. 5928, 54 Fed. Reg. 777 (Jan. 9, 1989) (proclamation of U.S. territorial sea). In addition, by statute, the United States has, subject to certain exceptions, conveyed to the USVI its right, title, and interest in submerged lands and mineral rights in those submerged lands out to three miles. *See* 48 U.S.C. §§ 1705, 1706 (2006); *see also*, *e.g.*, Proclamation No. 7399, 66 Fed. Reg. 7364 (Jan. 22, 2001) (proclamation of Virgin Islands Coral Reef National Monument). Any assertion of USVI control over submerged lands and mineral rights beyond those federal statutory limits would be inconsistent with federal law and should be removed. Federal law also reserves to the United States exclusive management rights over fisheries within the "exclusive economic zone." *See* 16 U.S.C. § 1811(a) (2006). Again, the proposed constitution must be made consistent with this federal statutory mandate. While the final sentence of Article XII, Section 2 acknowledges that the rights it addresses are alienable, we recommend modifying this language to make clearer that these matters are subject to Congress's plenary control.

### G.  Bill of Rights Provisions

As required by the Enabling Act, the proposed constitution includes a bill of rights. *See* Proposed Const. art. I; Enabling Act § 2(b)(3). Consistent with the supremacy of federal law, we understand these provisions as not purporting to constrain the Federal Government or federal law but as constraining only the USVI local government that would be established by this constitution and local laws.

In its memorandum on the 1980 proposed constitution, the Department of Justice observed that some provisions of the bill of rights and related sections in that constitution were not "drafted with adequate clarity and precision" and might therefore "result in litigation that could burden or curtail effective local government." *See DOJ Views*, 4B Op. O.L.C. at 761. The

same could be said of a number of provisions in the current proposed constitution.  For example, the current proposed constitution, like its 1980 predecessor, includes protections of unclear scope for the "dignity of the human being," the "right to a reasonable expectation of privacy," and the "right to examine any public document and to observe the deliberation of any agency of government."  Proposed Const. art. I, §§ 1, 3, 4.  The constitution also prohibits "employment of children" in certain occupations without specifying the maximum age of a "child," *id.* art. I, § 11(e); *see also id.* art. XII, § 1 (indicating that "[t]he Government shall establish laws to govern the employment of children under the age of fifteen"); and it fails to specify whether many of the rights it establishes apply only to government actors or also to intrusions by private parties.  *See DOJ Views*, 4B Op. O.L.C. at 761-63.

In 1980, the President declined to recommend changes to address such concerns. He observed:

> I believe there are some provisions in the constitution that will require interpretation by the courts. . . .  However, I do not feel it is appropriate for me to question the wisdom of entrusting the interpretation of these provisions to the courts.  This is a matter for serious discussion by the people of the Virgin Islands, for this document should truly be one of their own making.

1980 Presidential Message at v.  Because the same could be said of unclear provisions in the bill of rights and related sections of the current proposed constitution, we do not address such provisions in detail or recommend particular changes, but simply note the potential for uncertainty and litigation.

## H.  Repeal of Organic Statute Provisions

We also note that because federal law is superior to territorial enactments and may preempt contrary provisions of territorial law, Congress may need to repeal certain provisions of the USVI's organic statutes to enable this proposed constitution to operate, assuming it is approved by Congress and the USVI voters.  *Cf. DOJ Views*, 4B Op. O.L.C. at 771 (noting that a provision of the 1980 proposed constitution repealing laws, executive orders, and regulations inconsistent with the proposed constitution would be invalid if applied to "matters over which the Federal Government retained jurisdiction"); 1980 Presidential Message at v (noting that this transitional provision of the 1980 constitution "could exceed the authority of the Constitutional Convention if it is read to affect Federal law").  Some federal regulations and Executive Orders may also need to be revised or revoked.  The legislative history of the Enabling Act contemplates the submission by the President of a list of provisions requiring repeal "as a part of his comments on the constitution."  *See* S. Rep. No. 94-1033, at 4.  In 1980 the President, however, did not transmit such a list as part of his comments on the 1980 proposed constitution, but rather "indicated that [he] [would] submit the list in a timely manner to enable the Congress to effect the repeals prior to the effective date of the constitution."  S. Rep. No. 97-66, at 4.

## I.  Effect of Congressional Action or Inaction on the Proposed Constitution

Finally, the Enabling Act, as noted, provides that a proposed USVI constitution "shall be deemed to have been approved" if Congress takes no action on it within sixty legislative days

after its submission by the President. Enabling Act § 5. In 1978, Congress took no action on the proposed USVI constitution, which was then submitted to the USVI voters pursuant to the Enabling Act. *See DOJ Views*, 4B Op. O.L.C. at 760 & n.1, 772. In contrast, Congress expressly approved, by joint resolution, a modified version of the 1980 proposed constitution "for submission to the people of the Virgin Islands in accordance with the provisions of" the Enabling Act. *See* Pub. L. No. 97-21, 95 Stat. at 105.

As the Justice Department's 1980 memorandum explained, congressional inaction does not satisfy the constitutional requirements of bicameralism and presentment for valid federal legislation and therefore "cannot have any legal effect, except as . . . the occurrence of a condition which permits the submission of the constitution to the qualified electors of the Virgin Islands." *DOJ Views*, 4B Op. O.L.C. at 772. Such inaction therefore "would not have any curative effect on the defects of the constitution." *Id.* In fact, even formal approval of the proposed constitution need not be construed as federal endorsement of any constitutionally defective or otherwise invalid provisions. Upon signing the joint resolution approving the revised 1980 proposed constitution, President Reagan observed: "This legislation approves referring the constitution to the voters of the Virgin Islands for referendum. It does not represent a Federal endorsement of the constitution's substantive provisions." Statement on Signing a Bill To Approve a Constitution for the United States Virgin Islands, 1981 Pub. Papers 617, 617 (July 10, 1981). The legislative history indicates that Congress shared the same view. *See* S. Rep. No. 97-66, at 5 (expressing "no opinion on the advisability or merits of any provisions in the proposed constitution"); H.R. Rep. No. 97-25, at 3 (expressing "no opinion on the merits" of certain potentially invalid provisions because the committee "believe[d] that this is a matter to be considered by the voters, or perhaps, at some future time, by the courts").


/s/


RONALD WEICH
Assistant Attorney General for Legislative Affairs